1    MUNGER, TOLLES & OLSON LLP
     RONALD L. OLSON (State Bar No. 44597)
2    *Ron.Olson@mto.com*
     JOHM M. RAPPAPORT (State Bar No. 254459)
3    *John.Rappaport@mto.com*
     355 South Grand Avenue, Thirty-Fifth Floor
4    Los Angeles, CA 90071-1560
     Telephone: (213) 683-9100
5    Facsimile: (213) 687-3702

6    PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
     BRAD S. KARP     *(Pro Hac Vice applications to be filed)*
7    *bkarp@paulweiss.com*
     THEODORE V. WELLS, JR.
8    *twells@paulweiss.com*
     LYNN B. BAYARD
9    *lbayard@paulweiss.com*
     1285 Avenue of the Americas
10   New York, NY 10019-6064
     Telephone: (212) 373-3000
11   Facsimile: (212) 757-3990

12   Attorneys for Defendants
     NATIONAL FOOTBALL LEAGUE
13   and NFL PROPERTIES LLC

14              UNITED STATES DISTRICT COURT

15            CENTRAL DISTRICT OF CALIFORNIA

16   LARRY BARNES; WOODROW     CASE NO. CV11 08396 ODW JCGx
     "WOODY" BENNETT; SCOT
17   BRANTLEY; CEDRIC BROWN; JOSEPH    **NOTICE OF REMOVAL OF**
     "BARRY" BROWN and JEAN BROWN,     **CIVIL ACTION UNDER**
18   his wife; RUDOLPH BUKICH and        **28 U.S.C. § 1441**
     PATRICIA BUKICH, his wife; MICHAEL
19   CLOUD; BRIAN HOLLOWAY; JIMMIE
     GILES; CAROLYN LENS; DANNY
20   NOONAN; JOE PHILLIPS; GREGORY     **COMPLAINT FILED:**
     ROBERTS; JESSE SOLOMON; RALPH     Los Angeles Superior Court
21   WENZEL and ELEANOR PERFETTO, his   Case No. BC468483
     wife; JAMES WILDER; and ROES 1        August 26, 2011
22   through 200, Inclusive,

23            Plaintiffs,          **FIRST AMENDED COMPLAINT**
                                    **FILED:**
24   v.                                  August 31, 2011

25   NATIONAL FOOTBALL LEAGUE; NFL
     PROPERTIES LLC; RIDDELL, INC. d/b/a
26   RIDDELL SPORTS GROUP, INC.; ALL
     AMERICAN SPORTS CORPORATION,
27   d/b/a RIDDELL/ALL AMERICAN;
     RIDDELL SPORTS GROUP, INC.;

28

FILED
CLERK, U.S. DISTRICT COURT
OCT 11 2011
CENTRAL DISTRICT OF CALIFORNIA
BY

1  EASTON-BELL SPORTS, INC.;
   EASTON-BELL SPORTS, LLC; EB
2  SPORTS CORP.; and RBG HOLDINGS
   CORP., and DOES 1 through 100,
3  Inclusive,
4              Defendants.
5
6

7  TO THE CLERK OF THE UNITED STATES DISTRICT COURT FOR THE

8  CENTRAL DISTRICT OF CALIFORNIA:

9          PLEASE TAKE NOTICE that, for the reasons set forth below,

10 Defendants National Football League ("NFL") and NFL Properties LLC ("NFL

11 Properties"), collectively the "NFL Defendants," by their undersigned attorneys,

12 file this Notice of Removal to remove the claims against them in this action from

13 the Superior Court of the State of California, Los Angeles County, to the United

14 States District Court for the Central District of California pursuant to 28 U.S.C. §§

15 1367, 1441 and 1446. Removal is made pursuant to 28 U.S.C. § 1331 on the basis

16 of federal question jurisdiction. The grounds for removal are as follows:

17 **I.    INTRODUCTION AND BACKGROUND**

18         1.    On October 4, 2011, the NFL Defendants were served by

19 plaintiffs, former NFL players and certain of their wives, with a Summons and

20 First Amended Complaint (the "Amended Complaint") filed in the Superior Court

21 of the State of California, Los Angeles County, No. BC468483. Copies of these

22 papers and other documents filed in this action are annexed as **Exhibit A**. On

23 September 9 and 12, 2011, NFL Properties and the NFL, respectively, were served

24 by former NFL players and certain of their wives with a Summons and Complaint

25 filed in the Superior Court of the State of California, Los Angeles County, in

26 *Maxwell, et al.* v. *National Football League, et al.*, No. BC465842. On

27 September 9 and 12, 2011, NFL Properties and the NFL, respectively, were also

28

1  served with a Summons and Complaint filed in the Superior Court of the State of
2  California, Los Angeles County, in *Pear, et al.* v. *National Football League, et al.*,
3  No. LC094453. This action has been designated as related to the *Maxwell* and
4  *Pear* actions pursuant to Cal. Rules of Court, rule 3.300, and the NFL Defendants
5  are filing notices of removal in each of the three actions.

6         2.    The Amended Complaint alleges, among other things, that the
7  NFL failed to "warn and protect NFL players . . . against the long-term brain injury
8  risks associated with football-related concussions," failed to "enact league-wide
9  guidelines and mandatory rules regulating post-concussion medical treatment and
10 return-to-play standards for players who suffer a concussion," and fraudulently
11 misrepresented "that there was no link between concussions and later life
12 cognitive/brain injury." (Am. Compl. ¶¶ 55-56, 202.) The Amended Complaint
13 further alleges that NFL Properties "breached its duty to ensure that the equipment
14 it licensed and approved were of the highest possible quality and sufficient to
15 protect NFL players." (Am. Compl. ¶ 209.) The Amended Complaint alleges
16 causes of action for negligence, "negligence-monopolist," fraud, loss of
17 consortium, and wrongful death against the NFL, and negligence, loss of
18 consortium, and wrongful death against NFL Properties. (Am. Compl. ¶¶ 170-212,
19 232-34.) The Amended Complaint also alleges causes of action for strict liability
20 for manufacturing and design defects, failure to warn, negligence, loss of
21 consortium, and wrongful death against Riddell, Inc. d/b/a Riddell Sports Group,
22 Inc.; All American Sports Corp. d/b/a Riddell/All American; Riddell Sports Group,
23 Inc.; Easton-Bell Sports, Inc.; Easton-Bell Sports, LLC; EB Sports Corp.; and
24 RBG Holdings Corp. (collectively, the "Riddell Defendants"). (Am. Compl. ¶¶
25 213-34.) Plaintiffs seek recovery of compensatory and general damages, special
26 and incidental damages, punitive damages, and costs. (Am. Compl. p. 35.)

27        3.    The relationship between the NFL Defendants and NFL players
28 who played in the NFL from 1968 through 2010 is governed by various collective

bargaining agreements ("CBAs") that were executed and operative during those periods.[1] The CBAs are the product of exhaustive arm's-length negotiations between the NFL Management Council (the exclusive bargaining representative of the NFL) and the NFL Players Association (the exclusive bargaining representative of NFL players), and "represent[] the complete understanding of the parties on all subjects covered [t]herein." (CBA Art. II § 1 (1977-87; 1993-2010).) The CBAs include, among other terms, provisions relating to player medical care and safety, equipment and dispute resolution.

## II.    **GROUNDS FOR REMOVAL**

4.    This Court has original jurisdiction of this action under 28 U.S.C. § 1331 because the action is one that is founded on a claim or right "arising under the Constitution, laws, or treaties of the United States." A defendant may remove an action to federal court under 28 U.S.C. § 1441 if the complaint presents a federal question, such as a federal claim. *See Avco Corp.* v. *Aero Lodge No. 735*, 390 U.S. 557, 560, 88 S. Ct. 1235, 1237, 20 L. Ed. 2d 126 (1968).

5.    Federal question jurisdiction exists in this case based on complete preemption under section 301 of the Labor Management Relations Act ("LMRA") of all claims by plaintiffs who played in the NFL from 1968 to 2010 under operative CBAs.[2] *See Young* v. *Anthony's Fish Grottos, Inc.*, 830 F.2d 993,

---

[1] During certain periods of time, following the expiration of a CBA, but before the effective date of the following CBA (*e.g.*, 1987-1993), no CBA was operative. During these periods, however, certain provisions of the expired CBAs, including the arbitration provisions, remained in effect. *See Hayes* v. *Nat'l Football League*, 469 F. Supp. 252, 254 (C.D. Cal. 1979) ("[E]xpiration of the [CBA] between the [NFL and NFLPA] . . . does not excuse an otherwise existing requirement to exhaust the [CBA's] grievance procedures."); *Sherwin* v. *Indianapolis Colts, Inc.*, 752 F. Supp. 1172, 1174-75 & n.2 (N.D.N.Y. 1990) ("[T]he [expired] 1982 CBA continues to govern the relationship of the parties at least with respect to arbitration since the parties have continued to honor and utilize the arbitration provisions of the 1982 CBA.").

[2] The CBAs were signed by the NFL Management Council, an entity created by the NFL for the purpose of collective bargaining. The NFL is bound by the CBAs' terms and may invoke section 301 preemption because plaintiffs' claims arise under the CBA and require the Court to interpret numerous CBA provisions. *See Atwater* v. *Nat'l Football League*, 626 F.3d 1170, 1178-79 (11th Cir. 2010);

1  998 (9th Cir. 1987) ("[I]f federal law completely preempts a state law claim and

2  supplants it with a federal claim, the state law claim may be removed to federal

3  court.").

4        6.    The claims in the Amended Complaint brought by plaintiffs

5  who played prior to 1968 and during any interim periods between CBAs "form part

6  of the same case or controversy." 28 U.S.C. § 1367. This Court thus has

7  supplemental jurisdiction over all claims and parties. *See Bobadilla-German* v.

8  *Bear Creek Orchards, Inc.*, 641 F.3d 391, 394 (9th Cir. 2011) (holding that district

9  court "had jurisdiction over [plaintiffs'] state-law claims under 28 U.S.C. § 1367");

10  *Garcia* v. *Am. Red Cross*, No. CV-92 2513, 1992 WL 470325, at *1 (C.D. Cal.

11  Aug. 12, 1992) (denying plaintiffs' motion for remand based on lack of jurisdiction

12  over a pendent party co-defendant).

13        7.    The Central District of California is the federal district in which

14  the Superior Court of the State of California, County of Los Angeles—where

15  plaintiffs filed their Amended Complaint—is located.

16        8.    This Notice of Removal is timely under 28 U.S.C. § 1446(b),

17  which states that "notice of removal of a civil action or proceeding shall be filed

18  within thirty days after the receipt by the defendant, through service or otherwise,

19  of a copy of the initial pleading setting forth the claim for relief upon which such

20  action or proceeding is based."

21        9.    Written notice of the filing of this Notice of Removal will be

22  provided to plaintiffs, and a copy of this Notice will be filed in the appropriate

23  state court, as required by 28 U.S.C. § 1446(d). This Notice of Removal is signed

24  pursuant to Fed. R. Civ. Proc. 11. *See* 28 U.S.C. § 1446(a).

25        10.    Counsel for the Riddell Defendants has consented to the

26  removal of the action. All defendants thus have consented to removal of the

27

28  *Stringer* v. *Nat'l Football League*, 474 F. Supp. 2d 894, 901-92 (S.D. Ohio 2007).

1    action. *See Parrino* v. *FHP, Inc.*, 146 F.3d 699, 703 (9th Cir. 1998) ("All

2    defendants must join a notice of removal.").

3    **III. PLAINTIFFS' CLAIMS ARE PREEMPTED UNDER SECTION 301**

4    **OF THE LMRA**

5    11. Section 301 of the LMRA provides that the federal courts have

6    original jurisdiction over all "[s]uits for violation of contracts between an employer

7    and a labor organization." 29 U.S.C. § 185(a). The Supreme Court has held that

8    "questions relating to what the parties to a labor agreement agreed, and what legal

9    consequences were intended to flow from breaches of that agreement, must be

10   resolved by reference to uniform federal law, whether such questions arise in the

11   context of a suit for breach of contract or in a suit alleging liability in tort." *Allis-*

12   *Chalmers Corp.* v. *Lueck*, 471 U.S. 202, 211, 105 S. Ct. 1904, 1911, 85 L. Ed. 2d

13   206 (1985); *see also Hubbard* v. *United Airlines, Inc.*, 927 F.2d 1094, 1098-99 (9th

14   Cir. 1991) (holding that plaintiff's fraud and RICO claims were preempted because

15   allegations "involve[d] violation of a right created by the CBA"). Thus, section

16   301 preempts tort claims seeking to vindicate "state-law rights and obligations that

17   do not exist independently of [collective bargaining] agreements" and also claims

18   "substantially dependent upon analysis of the terms of [a collective-bargaining]

19   agreement." *Allis-Chalmers*, 471 U.S. at 213, 220; *Young*, 830 F.2d at 1001

20   (holding that plaintiff's fraud and misrepresentation claims were preempted by

21   section 301).

22   12. Here, the claims of plaintiffs who played in the NFL from 1968

23   to 2010 when CBAs were effective are preempted by section 301 because the

24   rights those plaintiffs seek to vindicate were created by the CBAs, and are not

25   based on an independent duty "owed to every person in society." *See United*

26   *Steelworkers of Am.* v. *Rawson*, 495 U.S. 362, 370-71, 110 S. Ct. 1904, 1910, 109

27   L. Ed. 2d 362 (1990) (holding in the context of a labor dispute involving unionized

28   employees that, absent an independent duty running from defendants "to every

1  person in society," any such duty to plaintiffs must arise out of the CBA); *see also*

2  *Adkins* v. *Mireles*, 526 F.3d 531, 540-41 (9th Cir. 2008) (holding that plaintiffs'

3  negligent misrepresentation claim was preempted because plaintiffs "failed to

4  show a separate, independent duty upon which to base this claim").

5         13.    Plaintiffs' claims also are preempted because those claims, and

6  the scope of any duty owed by the NFL Defendants, are "inextricably intertwined

7  with consideration of the terms of [the CBAs]" or "substantially dependent" on an

8  analysis of the relevant provisions of the CBAs. *Allis-Chalmers*, 471 U.S. at 213,

9  215, 220; *see also Bale* v. *Gen. Tel. Co. of Ca.*, 795 F.2d 775, 780 (9th Cir. 1986)

10 (holding that plaintiffs' fraud and negligent misrepresentation claims were

11 preempted because their "adjudication . . . would require reference to, and

12 interpretation of, the terms of the collective bargaining agreement"); *Stringer* v.

13 *Nat'l Football League*, 474 F. Supp. 2d 894, 909-10 (S.D. Ohio 2007) (wrongful

14 death claim against the NFL based on, among other things, the NFL's alleged

15 failure to regulate adequately practices, games, equipment, and medical care to

16 minimize the risk of heat-related illness, was preempted because the claim was

17 "inextricably intertwined and substantially dependent upon an analysis of certain

18 CBA provisions imposing duties on the clubs with respect to medical care and

19 treatment of NFL players").

20        14.    For example, adjudicating plaintiffs' claims will hinge on

21 provisions of the CBAs relating to player medical care, rule-making, and

22 equipment safety. *See, e.g.*, NFL CBA Art. XXXI § 1 (1982), Art. XLIV § 1

23 (1993) (requiring physician on staff of Member Clubs to inform a player in writing

24 if he has a physical condition that "could be significantly aggravated by continued

25 performance"); NFL CBA Art. XXXI § 2 (1982-87), Art. XLIV § 2 (1993-2010)

26 ("[F]ull-time head trainers and assistant trainers . . . [must] be certified by the

27 National Athletic Trainers association."); Constitution and By-Laws for Major

28 Professional Football Operations as Conducted by the National Football League

1    and the American Football League, Art. XIX, § 19.5 (1969), and NFL Constitution

2    and Bylaws Art. XIX § 19.5 (1970-2010) (requiring that the home team provide a

3    doctor and ambulance for each game since the AFL-NFL merger);[3] NFL

4    Constitution and Bylaws Art. XVII supplement 12 (1980), Art. XVII (1984-85),

5    Art. XVII § 17.16(E) (1988-2010) ("All determinations of recovery time for major

6    and minor injuries must be by the club's medical staff and in accordance with the

7    club's medical standards" for players categorized as "Reserve/Injured" on the

8    Reserve List); NFL CBA Art. V §§ 1-4 (1970-77), Art. XI § 8 (1977-87), Art. XIII

9    § 1(a) (1993-2010) (creating a Joint Committee to study, among other things,

10   player safety issues); NFL CBA Art. XI § 8 (1977-82), Art. XIII § 1(d) (2002-10),

11   Art. XI § 8 (1982-87), Art. XIII § 1(b)-(c) (1993-2010) (mandating procedures for

12   review, investigation and resolution of disputes involving proposed rule changes

13   that "could adversely affect player safety"); Art. XI § 9 (1977-87), Art. XIII § 2

14   (1993-2010) (inviting player representatives to the Competition Committee

15   meetings "to represent the players' viewpoint on rules").    Indeed, a court

16   considering allegations similar to those alleged here determined that plaintiff's

17   claim was substantially dependent on, and inextricably intertwined with, an

18   analysis of CBA provisions concerning medical care and treatment of NFL players.

19   *See Stringer*, 474 F. Supp. 2d at 911.

20          15.    Although plaintiffs allege that they are not covered by CBAs

21   because "NFL retired players have never been the subject of or a party to

22   Collective Bargaining" (Am. Compl. ¶ 38), plaintiffs' claims are premised solely

23   on alleged conduct occurring at the time that they played NFL football. (*See, e.g.*,

24   Am. Compl. ¶ 51(a) ("[The NFL] owed a duty to protect Plaintiffs on the playing

25   field"); Am. Compl. ¶ 51(d) ("[The NFL] owed a duty to Plaintiffs to have in place

26

27   [3] The Constitution and Bylaws are incorporated by reference in the CBA. *See Hill* v. *Potter*, No. 06-7051, 2010 WL 4450405, at *4 (C.D. Cal. Oct. 29, 2010)

28   (documents referenced in CBA are incorporated into the CBA).

1    strict return-to-play guidelines to prevent CTE and/or concussion injury").)
2    Therefore, to resolve plaintiffs' claims, the Court will need to interpret provisions
3    of the CBAs that were operative during plaintiffs' NFL careers. *See Mendes* v.
4    *W.M. Lyles Co.*, No. CIV F 07-1265, 2008 WL 171003, at *10 (E.D. Cal. Jan. 18,
5    2008) (dismissing plaintiff's underpayment claims for failure to exhaust grievance
6    remedies contained in an expired collective bargaining agreement that was
7    operative during the time the alleged underpayment took place); *Cameron* v.
8    *Idearc Media Corp.*, No. 08-12010, 2009 WL 2496439, at *6 (D. Mass. Aug. 13,
9    2009) (finding section 301 preemption of tortious interference claim brought after
10   expiration of CBA when claim related to termination of employment prior to
11   expiration).

12          16.    In filing this Notice of Removal, the NFL Defendants do not
13   waive any defenses that may be available to them, including without limitation
14   jurisdiction, venue, standing, or procedures for the disposition of this action in
15   accordance with the terms of the CBA. Nor do the NFL Defendants admit any of
16   the factual allegations in the Amended Complaint; they expressly reserve the right
17   to contest those allegations at the appropriate time.

18          WHEREFORE, the NFL Defendants remove the above-captioned
19   action brought against them in the Superior Court of the State of California, Los
20   Angeles County.

21
22
23
24
25
26
27
28

NOTICE OF REMOVAL OF CIVIL
ACTION UNDER 28 U.S.C. § 1441

DATED: October 11, 2011     MUNGER, TOLLES & OLSON LLP


By: _Ron Olson \ir_____
     RONALD L. OLSON

-and-

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP

Attorneys for Defendants
NATIONAL FOOTBALL LEAGUE
and NFL PROPERTIES LLC

# EXHIBIT A

# Case Summary

Please make a note of the Case Number.

<u>Click here to access document images for this case.</u>
If this link fails, you may go to the Case Document Images site and search using the case number displayed on this page.

**Case Number:** BC468483
**LARRY BARNES ET AL VS NATIONAL FOOTBALL LEAGUE ET AL**

**Filing Date:** 08/26/2011
**Case Type:** Fraud (no contract) (General Jurisdiction)
**Status:** Pending

---

## Future Hearings
None

---

<u>Documents Filed</u> | <u>Proceeding Information</u>

## Parties

Click on any of the below link(s) to see names that begin with the letter indicated:
<u>A - P</u>   <u>R - W</u>

ALL AMERICAN SPORTS CORPORATION - Defendant/Respondent

BARNES LARRY - Plaintiff/Petitioner

BENNETT WOODROW (WOODY) - Plaintiff/Petitioner

BROWN CEDRIC - Plaintiff/Petitioner

BROWN JEAN - Plaintiff/Petitioner

BROWN JOSEPH (BARRY) - Plaintiff/Petitioner

BUKICH PATRICIA - Plaintiff/Petitioner

BUKICH RUDOLPH - Plaintiff/Petitioner

CLOUD MICHAEL - Plaintiff/Petitioner

DOES 1 THROUGH 100 - Defendant/Respondent

EASTON-BELL SPORTS INC. - Defendant/Respondent

EASTON-BELL SPORTS LLC - Defendant/Respondent

Ex A_000011

EB SPORTS CORP. - Defendant/Respondent

GILES JIMMIE - Plaintiff/Petitioner

HOLLOWAY BRIAN - Plaintiff/Petitioner

LENS CAROLYN - Plaintiff/Petitioner

NATIONAL FOOTBALL LEAGUE - Defendant/Respondent

NFL PROPERTIES LLC - Defendant/Respondent

NOONAN DANNY - Plaintiff/Petitioner

PERFETTO ELEANOR - Plaintiff/Petitioner

PHILLIPS JOE - Plaintiff/Petitioner

Click on any of the below link(s) to see names that begin with the letter indicated:
TOP   A - P   R - W

RADLOFF WAYNE - Plaintiff/Petitioner

RBG HOLDINGS CORP. - Defendant/Respondent

RIDDELL INC. - Defendant/Respondent

RIDDELL SPORTS GROUP INC. - Defendant/Respondent's DBA

RIDDELL SPORTS GROUP INC. - Defendant/Respondent

RIDDELL/ALL AMERICAN - Defendant/Respondent's DBA

ROBERTS GREGORY - Plaintiff/Petitioner

ROSEN DAVID A. ESQ. - Attorney for Plaintiff/Petitioner

SELMON DEWEY - Plaintiff/Petitioner

SELMON LEE ROY - Plaintiff/Petitioner

SOLOMON JESSE - Plaintiff/Petitioner

WENZEL RALPH - Plaintiff/Petitioner

WILDER JAMES - Plaintiff/Petitioner

Click on any of the below link(s) to see names that begin with the letter indicated:
TOP   A - P   R - W

---

Case Information | Party Information | Proceeding Information

Ex A_000012

Please make a note of the Case Number.

Click here to access document images for this case.
If this link fails, you may go to the Case Document Images site and search using
the case number displayed on this page.

**Documents Filed** (Filing dates listed in descending order)

**09/13/2011** Request and Entry of Dismissal (WITHOUT PREJUDICE; COMPLAINT;
AS TO PLAINTIFFS LEE ROY SELMON AND DEWEY SELMON ONLY.THIS IS NOT A
RETRAXIT )
Filed by Attorney for Pltf/Petnr

**08/31/2011** Summons Filed
Filed by Attorney for Pltf/Petnr

**08/31/2011** Notice-Related Cases
Filed by Attorney for Pltf/Petnr

**08/31/2011** First Amended Complaint
Filed by Attorney for Pltf/Petnr

**08/26/2011** Complaint

---

Case Information | Party Information | Documents Filed

**Proceedings Held** (Proceeding dates listed in descending order)
None

---

Case Information | Party Information | Documents Filed | Proceeding Information

Ex A_000013

1   ROSE, KLEIN & MARIAS LLP
    DAVID A. ROSEN (State Bar No. 101287)
2   801 S. Grand Avenue
    11th Floor
3   Los Angeles, California 90017-4645
    (213) 626-0571
4   (213) 623-7755 Fax

5   Attorneys for Plaintiffs

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF LOS ANGELES

AUG 26 2011

John A. Clarke, Executive Officer/Clerk

BY _____, Deputy
Shaunya Wesley

6

7

8                  **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                      **FOR THE COUNTY OF LOS ANGELES**

10                                                      B C 4 6 8 4 8 3

| | |
|---|---|
| 11   LARRY BARNES; WOODROW "WOODY" BENNETT; CEDRIC BROWN; JOSEPH "BARRY" BROWN and JEAN BROWN, his wife; RUDOLPH BUKICH and PATRICIA BUKICH, his wife; MICHAEL CLOUD; BRIAN HOLLOWAY; JIMMIE GILES; CAROLYN LENS; DANNY NOONAN; JOE PHILLIPS; WAYNE RADLOFF; GREGORY ROBERTS; DEWEY SELMON; LEE ROY SELMON; JESSE SOLOMON; RALPH WENZEL and ELEANOR PERFETTO, his wife; JAMES WILDER; and ROES 1 through 200, Inclusive, | CASE NO. |

11   LARRY BARNES; WOODROW "WOODY"
     BENNETT; CEDRIC BROWN; JOSEPH
12   "BARRY" BROWN and JEAN BROWN, his
     wife; RUDOLPH BUKICH and PATRICIA
13   BUKICH, his wife; MICHAEL CLOUD;
     BRIAN HOLLOWAY; JIMMIE GILES;
14   CAROLYN LENS; DANNY NOONAN; JOE
     PHILLIPS; WAYNE RADLOFF; GREGORY
15   ROBERTS; DEWEY SELMON; LEE ROY
     SELMON; JESSE SOLOMON; RALPH
16   WENZEL and ELEANOR PERFETTO, his
     wife; JAMES WILDER; and ROES 1 through
17   200, Inclusive,

18                  Plaintiffs,

19   v.

20   NATIONAL FOOTBALL LEAGUE; NFL
     PROPERTIES LLC; RIDDELL, INC.
21   d.b.a.RIDDELL SPORTS GROUP, INC., ALL
     AMERICAN SPORTS CORPORATION, d.b.a.
22   RIDDELL/ALL AMERICAN; RIDDELL
     SPORTS GROUP, INC. EASTON-BELL
23   SPORTS, INC.; EASTON-BELL SPORTS,
     LLC; EB SPORTS CORP.; and RBG
24   HOLDINGS CORP.; and DOES 1 through 100,
     Inclusive,

25

26                  Defendants.

CASE NO.

1.  **Negligence - Monopolist**
2.  **Negligence**
3.  **Fraud**
4.  **Negligence**
5.  **Strict Liability - Design Defect**
6.  **Strict Liability - Manufacturing Defect**
7.  **Failure to Warn**
8.  **Negligence**
9.  **Loss of Consortium**
10. **Wrongful Death**

27   The Plaintiffs, all individuals, hereby complain of Defendants, and each of them, listed

28   above and hereby allege as follows:

Ex A_000014

**PARTIES**

**Plaintiffs:**

1.  Mr. Ralph Wenzel and his wife, Eleanor Perfetto, are residents of and are domiciled in the State of Maryland.

2.  Mr. Woodrow Bennett is a resident of and is domiciled in the State of Florida.

3.  Mrs. Carolyn Lens, widow of decedent Greg Lens, is a resident of and is domiciled in the State of Texas.

4.  Mr. Joseph "Barry" Brown and his wife, Jean, are residents of and are domiciled in the State of Maryland.

5.  Mr. Jimmie Giles is a resident of and is domiciled in the State of Florida.

6.  Mr. Rudolph Bukich and his wife, Patricia, are residents of and are domiciled in the State of California.

7.  Mr. Brian Holloway is a resident of and is domiciled in the State of Florida.

8.  Mr. Wayne Radloff is a resident of and is domiciled in the State of South Carolina.

9.  Mr. Lee Roy Selmon is a resident of and is domiciled in the State of Florida.

10. Mr. Joe Phillips is a resident of and is domiciled in the State of Oregon.

11. Michael Cloud is a resident of and is domiciled in the State of Texas.

12. Larry Barnes is a resident of and is domiciled in the State of Florida.

13. Jesse Solomon is a resident of and is domiciled in the State of Florida.

14. Gregory Roberts is a resident of and is domiciled in the State of Florida.

15. James Wilder is a resident of and is domiciled in the State of Florida.

16. Scot Brantley is a resident of and is domiciled in the State of Florida.

17. Cedric Brown is a resident of and is domiciled in the State of Oklahoma.

18. Danny Noonan is a resident of and is domiciled in the State of Nebraska.

19. The true names and capacities of plaintiffs ROES 1 through 200, inclusive, are unknown individuals at the present time. When the true names and capacities of said plaintiffs are ascertained, plaintiffs will ask leave of court to amend this complaint by setting forth same.

///

-2-

Ex A_000015

**Defendants:**

20.     The true names and capacities of defendants DOES 1 through 100, inclusive, whether individual, corporate, associate or otherwise, are unknown to plaintiffs at the present time. When plaintiffs ascertain such true names and capacities of said defendants, they will ask leave of court to amend this complaint by setting forth same.

21.     All defendants, and each of them, were in some fashion legally responsible for the injuries and damages complained of herein.

22.     At all times herein mentioned, defendants, and each of them, were the agents, servants, and employees each of the other, acting within the course and scope of said agency and employment.

23.     Defendant National Football League ("the NFL") is an unincorporated association with its headquarters located in the State of New York.  The NFL regularly conducts business in California.

24.     Defendant NFL Properties, LLC as the successor-in-interest to National Football League Properties, Inc. ("NFL Properties") is a limited liability company organized and existing under the laws of the State of Delaware with its headquarters in the State of New York.  NFL Properties is engaged, among other activities, approving licensing and promoting equipment used by all the NFL teams.  NFL Properties regularly conducts business in California.

25.     Defendant Riddell, Inc. (d.b.a. Riddell Sports Group, Inc.) is a corporation organized and existing under the laws of the State of Illinois, and is engaged in the business of designing, manufacturing, selling and distributing football equipment, including helmets, to the NFL and since 1989 has been the official helmet of the NFL.  Riddell, Inc. regularly conducts business in California.

26.     Defendant All American Sports Corporation, d.b.a. Riddell/All American, is a corporation organized and existing under the laws of the State of Delaware and is engaged in the business of designing, manufacturing, selling and distributing football equipment, including helmets, to the NFL and since 1989 has been the official helmet of the NFL.  All American Sports regularly conducts business in California.

-3-

Ex A_000016

27. Defendant Riddell Sports Group, Inc. is a Delaware corporation with its principal place of business at 6255 N. State Highway, #300, Irving, TX 76038. Riddell Sports Group, Inc. regularly conducts business in California.

28. Defendant Easton-Bell Sports, Inc., is a California corporation, incorporated in Delaware with a principal place of business at 7855 Haskell Avenue, Suite 200, Van Nuys, CA, 91406 and is a parent corporation of Riddell Sports Group Inc.

29. Defendant Easton-Bell Sports, LLC is the parent corporation of Easton-Bell Sports, Inc., and is incorporated in Delaware, with a principal place of business at 152 West 57th Street, New York, NY 10019. Easton-Bell Sports, LLC regularly conducts business in California.

30. Defendant EB Sports Corp., is a Delaware Corporation with its principal place of business at 7855 Haskell Avenue, Van Nuys, CA 91406.

31. Defendant RBG Holdings Corp. is a Delaware corporation with its principal place of business at 7855 Haskell Avenue, Suite 350, Van Nuys, CA 91406.

32. Defendants Riddell, Inc., Riddell Sports Group, Inc., All American Sports Corporation, Easton-Bell Sports, Inc., EB Sports Corp., Easton Bell Sports, LLC, and RBG Holdings Corp., shall hereinafter be referred to collectively as the "Riddell Defendants."

## JURISDICTION AND VENUE

33. Jurisdiction is based upon the California Constitution Article 6, Section 10.

34. Venue is proper in this Court pursuant to Section 395(a) of the California Code of Civil Procedure.

## GENERAL ALLEGATIONS AS TO ALL DEFENDANTS

35. The National Football League consists of two structured conferences, the AFC and the NFC, with 32 team members.

36. Each team functions as a separate business but operates under shared revenue generated through broadcasting, merchandising and licensing.

37. The Supreme Court of the United States of America ruled in *American Needle, Inc. v. NFL, et al.* (U.S. 2010) 130 S. Ct. 2201 that the NFL is a separate entity from each of its teams.

///

-4-

Ex A_000017

38.     The NFL is by far the most attended domestic sports league with an average attendance per game of 67,509 fans in the regular season (2009).

39.     The NFL is a 9 billion dollar-a-year business.

## NFL AND THE CBA

40.     Until March of 2011, all NFL players were members of a union called the National Football League Players Association ("NFLPA"). The NFLPA negotiates the general minimum contract for all players in the league with the National Football League Management Council ("NFLMC"). This contract is called the Collective Bargaining Agreement ("CBA") and it is the central document that governs the negotiation of individual player contracts for all of the league's players. However, historically, the NFL retired players have never been the subject of nor a party to Collective Bargaining.

41.     The plaintiffs herein are all retirees and thus not covered by the CBA nor are they a subject of or parties to bargaining between the NFL and the NFLPA. Thus, the plaintiffs' claims are not preempted by federal labor law since any CBA in force does not apply to their claims.

## CTE AND CONCUSSION INJURY

42.     In 2002, Dr. Bennet Omalu, a foresic pathologist and neuropathogist, found Chronic Traumatic Encephalopathy (CTE) in the brain of Hall of Famer, Mike Webster, a former NFL player.

43.     By 2007, Dr. Omalu found a fourth case linking the death of a former NFL player to CTE brain damage from his football career. CTE manifests similarly as in "punch drunk" boxers.

44.     Around the same time, other researchers without NFL ties surveyed retired football players and their findings showed that players who had multiple concussions were more likely to report being diagnosed with depression.

45.     The NFL undertook the responsibility of studying concussion research in 1994 through funding a Committee known as the "NFL Committee on Mild Traumatic Brain Injury."

46.     The NFL Committee on Mild Traumatic Brain Injury published their findings in 2004 showing "no evidence of worsening injury or chronic cumulative effects" from multiple

-5-

Ex A_000018

1 concussions.  In a related study, the Committee found "many NFL players can be safely allowed to

2 return to play" on the day of a concussion if they are without symptoms and cleared by a physician.

3      47.    As further evidence, Commissioner Roger Goodell in June of 2007 admittedly

4 publicly that the NFL has been studying the effects of traumatic brain injury for "close to 14

5 years..."

6      48.    On or about October 28, 2009, Dr. Robert Cantu and Dr. Ann McKee testified

7 before the House of Representatives, Committee on the Judiciary, to discuss the long term impact

8 of football related head injuries.  This was the first instance in which the connection between

9 football head injuries and dementia, memory loss, CTE and related symptoms was disseminated to

10 the public at large.

11      49.    At no time prior to October 28, 2009 did any Plaintiff to this action have knowledge

12 of the connection between football head injuries and dementia, memory loss, CTE and related

13 symptoms.

14      50.    It was not until June of 2010 that the NFL publicly acknowledged that concussions

15 can lead to dementia, memory loss, CTE and related symptoms by publishing warning to every

16 player and team.

17 **NFL'S DUTY TO PLAYERS AND THE PUBLIC**

18      51.    The NFL overtly undertook a duty to study concussions on behalf of all American

19 Rules Football leagues and players.

20      52.    All American Rules Football leagues modeled their programs after the NFL.

21      53.    In turn, the NFL possesses monopoly power over American Football.  As such, it

22 also possesses monopoly power over the research and education of football injuries to physicians,

23 trainers, coaches and individuals with brain damage such as Plaintiffs who played in the NFL, as

24 well as the public at large.  As a result, it owed a duty to everyone including individuals such as

25 Plaintiffs in the following respects:

26      (a)    It owed a duty of reasonable care to protect Plaintiffs on the playing field;

27      (b)    It owed a duty of reasonable care to Plaintiffs to educate them and other players in

28          the NFL about CTE and/or concussion injury;

-6-

Ex A_000019

(c)     It owed a duty of reasonable care to Plaintiffs to educate trainers, physicians, and coaches about CTE and/or concussion injury;

(d)     It owed a duty of reasonable care to Plaintiffs to have in place strict return-to-play guidelines to prevent CTE and/or concussion injury;

(e)     It owed a duty of reasonable care to Plaintiffs to promote a "whistleblower" system where teammates would bring to the attention of a trainer, physician or coach that another player had sustained concussion injury;

(f)     It owed a duty of reasonable care to Plaintiffs to design rules and penalties for players who use their head or upper body to hit or tackle;

(g)     It owed a duty of reasonable care to Plaintiffs to design rules to eliminate the risk of concussion during games and/or practices;

(h)     It owed a duty of reasonable care to Plaintiffs to promote research into and cure for CTE and the effects of concussion injury over a period of time; and

(i)     It owed a duty of reasonable care to State governments, local sports organizations, all American Rules Football leagues and players, and the public at large to protect against the long-term effects of CTE and/or concussion injury.

54.     The NFL knew as early as the 1920's of the potential harmful effects on a player's brain of concussions; however, until June of 2010 they concealed these facts from coaches, trainers, players and the public.

55.     Prior to June 2010, Plaintiffs did not know, nor did they have reason to know, the long-term effects of concussions and relied on the NFL and the Riddell Defendants to protect them.

## NFL'S KNOWLEDGE OF THE RISK OF CONCUSSIONS

56.     For decades, Defendants have known that multiple blows to the head can lead to long-term brain injury, including memory loss, dementia, depression and CTE and its related symptoms.

///

///

Ex A_000020

57. This action arises from the Defendants' failure to warn and protect NFL players, such as Plaintiffs, against the long-term brain injury risks associated with football-related concussions.

58. This action arises because while the NFL Defendants undertook to investigate, research, and promulgate multiple safety rules, the NFL Defendants committed negligence by failing to act reasonably and exercise their duty to enact league-wide guidelines and mandatory rules regulating post-concussion medical treatment and return-to-play standards for players who suffer a concussion and/or multiple concussions.

59. By failing to exercise its duty to enact reasonable and prudent rules to protect players against the risks associated with repeated brain trauma, the NFL's failure to exercise its independent duty has led to the deaths of some, and brain injuries of many other former players.

60. Throughout the past century and through the present, the published frank medical literature in the United States and other industrialized countries has included case reports, studies, reviews, and peer-reviewed articles relating to and discussing the harmful effect on humans, and particularly players of American football, of repeated concessive blows to the head. These publications were all available and easily accessible to all Defendants.

61. The NFL's ongoing undertaking to protect the health and safety of the players is evidenced by the NFL's enactment of at least the following non-exhaustive list of rules pertaining to players' health and safety, particularly relating to blows to the head:

(a) In 1956, the NFL enacted a rule that prohibited the grabbing of any player's facemask, other than the ball carrier;

(b) In 1962, the NFL enacted a rule that prohibited players from grabbing any player's facemask;

(c) In 1976, the NFL enacted a rule that prohibited players from grabbing the facemask of an opponent. The penalty for an incidental grasp of the facemask was 5 yards. The penalty for twisting, turning, or pulling the facemask was 15 yards. A player could be ejected from the game if the foul is judged to be vicious and/or flagrant;

///

-8-

(d)   In 1977, the NFL enacted a rule that prohibited players from slapping the head of another playing during play. This rule was referred to as the "Deacon Jones Rule," named after the Rams' defensive end who frequently used this technique;

(e)   In 1977, the NFL enacted a rule that prohibited Offensive Lineman from thrusting their hands into a defender's neck, face, or head;

(f)   In 1979, the NFL enacted a rule that prohibited players from using their helmets to butt, spear, or ram an opponent. Pursuant to this rule, any player who used the crown or top of his helmet unnecessarily will be called for unnecessary roughness;

(g)   In 1980, the NFL enacted rule changes that provided greater restrictions on contact in the area of the head, neck, and face;

(h)   In 1980, the NFL enacted rule changes that prohibited players from directly striking, swinging, or clubbing the head, neck, or face ("personal foul"). Beginning in 1980, a penalty could be called for such contact whether or not the initial contact was made below the neck area;

(i)   In 1982, the NFL enacted a rule change by which the penalty for incidental grabbing of a facemask by a defensive team was changed from 5 yards to an automatic first down plus a 5 yard penalty;

(j)   In 1983, the NFL enacted a rule that prohibited players from using a helmet as a weapon to strike or hit an opponent;

(k)   In 1988, the NFL enacted a rule that prohibited defensive players from hitting quarterbacks below the waist while they are still in the pocket. (The rule was unofficially called the "Andre Waters Rule" based upon a hit that Waters placed on Los Angeles Rams quarterback Jim Everett in 1988); and

(l)   Following the 2004-2005 season, the NFL's Competition Committee reviewed video of the entire season and concluded that the horse-collar tackle resulted in six serious injuries. On May 23, 2005, the NFL owners voted 27-5 to ban such tackles. The ban states that a horse-collar tackle is an open-field tackle in which a defender uses the shoulder pads to immediately bring a ball carrier down.

Ex A_000022

## NFL FRAUDULENTLY CONCEALED
## THE LONG-TERM EFFECTS OF CONCUSSIONS

62.     Instead of taking measures to actually protect its players from suffering long-term brain injuries, the NFL created the "Mild Traumatic Brain Injury Committee" in 1994 to purportedly study the effects of concussions on NFL players.

63.     The Mild Traumatic Brain Injury Committee was chaired by Dr. Elliot Pellman, a rheumatologist who is not certified as to brain injuries and/or concussions.

64.     After 14 years of purported studies, and after numerous medical journal articles were written by the NFL's Mild Traumatic Brain Injury Committee (the "NFL's Brain Injury, Committee"), concluded that "[b]ecause a significant percentage of players returned to play in the same game [as they suffered a mild traumatic brain injury] and the overwhelming majority of players with concussions were kept out of football-related activities for less than 1 week, it can be concluded that mild TBI's in professional football are not serious injuries." See "Concussion in professional football: Summary of the research conducted by the National Football League's Committee on Mild Traumatic Brain Injury," *Neurosurg Focus* 21 (4):EI2; 2006, RI. Pellman and D.C. Viano.

65.     According to the NFL's own committee, the speedy return to play after suffering a concussion demonstrates that such players were not at a greater risk of suffering long-term brain injury.

66.     The NFL-funded study is completely devoid of logic and science. More importantly, it is contrary to their Health and Safety Rules as well as 75 years of published medical literature on concussions.

67.     Between 2002 and 2005, a series of clinical and neuropathological studies performed by independent scientists and physicians demonstrated that multiple NFL induced-concussions cause cognitive problems such as depression, early on-set dementia and CTE and its related symptoms.

68.     In response to these studies, the NFL, to further a scheme of fraud and deceit, had members of the NFL's Brain Injury Committee deny knowledge of a link between concussion and

-10-

Ex A_000023

1 cognitive decline and claim that more time was needed to reach a definitive conclusion on the
2 issue.

3    69.    When the NFL's Brain Injury Committee anticipated studies that would implicate
4 causal links between concussion and cognitive degeneration it promptly published articles
5 producing contrary findings, although false, distorted and deceiving as part of the NFL's scheme to
6 deceive Congress, the players and the public at large.

7    70.    Between 2002 and 2007, Dr. Bennet Omalu examined the brain tissue of deceased
8 NFL players including Mike Webster, Terry Long, Andrew Waters and Justin Strzelczyk. Dr.
9 Omalu in an article in *Neurosurgery* concluded that chronic traumatic encephalopathy ("CTE")
10 triggered by multiple NFL concussions represented a partial cause of their deaths.

11    71.    In response to Dr. Omalu's article, the NFL acting thru the NFL's Brain Injury
12 Committee, Drs. Ira Casson, Elliott Pellman and David Viano wrote a letter to the editor of
13 *Neurosurgery* asking that Dr. Omalu's article be retracted.

14    72.    In 2005, a clinical study performed by Dr. Kevin Guskiewicz found that retired
15 players who sustained three or more concussions in the NFL had a five-fold prevalence of mild
16 cognitive impairment. The NFL's Brain Injury Committee, Dr. Mark Lowell, promptly attacked
17 the article by refusing to accept a survey of 2,400 former NFL players.

18    73.    Because of Congressional scrutiny and media pressure, the NFL scheduled a
19 league-wide Concussion Summit for June 2007. Unfortunately, the NFL in keeping with its
20 scheme of fraud and deceit issued a pamphlet to players in August 2007, which stated: "there is no
21 magic number for how many concussions is too many."

22    74.    When Boston University's Dr. Ann McKee found CTE in the brains two more
23 deceased NFL players in 2008, Dr. Ira Casson characterized each study as an "isolated incident"
24 from which no conclusion could be drawn.

25    75.    At the October 2009 Congressional hearings of the House Judiciary Committee,
26 committee member Linda Sanchez (D-CA) analogized the NFL's denial of a causal link between
27 NFL concussion and cognitive decline to the Tobacco industry's denial of the link between
28 cigarette consumption and ill health effects.

Ex A_000024

76. Since at least 2002, the NFL Committee has been on direct notice of multiple NFL head injuries contributing to cognitive decline in later life, yet it has never amended the2007 NFL's Brain Injury Committee statement: "Current research with professional athletes has not shown that having more than one or two concussions leads to permanent problems ... It is important to understand that there is no magic number for how many concussions is too many."

77. As of June 2010, the NFL had yet to amend these inaccurate and misrepresentative statements to any Plaintiff or retiree.

## THE NFL ACKNOWLEDGES THEIR DUTY TO PROTECT AGAINST
## THE LONG-TERM RISK OF CONCUSSIONS

78. On August 14, 2007, the NFL acknowledged its duty to players by enacting rules to protect them against the risks associated with repeated brain trauma.

79. The NFL's 2007 concussion guidelines, many of which stemmed from an NFL conference in June of 2007 involving team trainers and doctors, were sent to all current players and other team personnel.

80. The NFL's 2007 guidelines on concussion management include a whistle-blower provision for individuals to report concussions with the league so that a player with a head injury is not forced to practice or play against medical advice.

81. The NFL's 2007 concussion guidelines also include an informational pamphlet provided to all current NFL players to aid in identifying symptoms of a concussion. This information was later withdrawn by one of the outside counsel of the NFL in a separate letter to its disability plan, as well as the NFL's August 14, 2007 press release denying that "more than one or two concussions leads to permanent problems."

82. In a statement issued by the NFL on August 14, 2007, Roger Goodell, the Commissioner of the NFL, introduced the NFL's 2007 concussion guidelines by saying, "We want to make sure all NFL players, coaches and staff members are fully informed and take advantage of the most up-to-date information and resources as we continue to study the long-term impact of concussions."

///

-12-

Ex A_000025

83. The NFL's Commissioner also stated, "[b]ecause of the unique and complex nature of the brain, our goal is to continue to have concussions managed conservatively by outstanding medical personnel in a way that clearly emphasizes player safety over competitive concerns."

84. The NFL's 2007 concussion guidelines provide when a player with a concussion can return to a game or practice.

85. The NFL's 2007 concussion guidelines specifically mandate that a player should. The NFL's 2007 concussion guidelines specifically mandate that a player should have no concussion symptoms and normal neurological test results before returning to play.

86. For the past many decades until August 14, 2007, the NFL's duty to protect its players has never changed and has, ever waned. The only change that occurred is that on August 14, 2007, the NFL finally and unequivocally acted upon its longstanding players by implementing league-wide concussion guidelines.

87. Importantly, the NFL themselves acknowledged that the 2007 guidelines were inadequate and insufficient. As a result, the NFL enacted more strict regulations to handle concussions starting in the 2009 season. Specifically, the NFL announced new rules on managing concussions requiring players who exhibit any significant concussion signs to be removed from a game or practice and be barred from returning the same day.

88. Nevertheless; it was not until June of 2010 that the NFL warned any player of the long-term risks associated with multiple concussions, including dementia, memory loss, CTE and its related symptoms. The Riddell Defendants also failed to so warn active players until approximately the same time frame.

89. As of today, the NFL Defendants and the Riddell Defendants have never warned any Plaintiff or retired player of the long-term health effects of concussions.

## THE DEFENDANTS' CONDUCT RISES BEYOND MERE NEGLIGENCE

90. The aforementioned acts and omissions of the Defendants demonstrate that the Defendants acted with callous indifference to the rights and duties owed to Plaintiffs, all American Rules Football leagues and players and the public at large.

///

-13-

Ex A_000026

91.     The Defendants acted wilfully, wantonly, egregiously, with reckless abandon, and with a high degree of moral culpability.  Defendants, and each of them, knew that a substantial risk of physical and mental harm to NFL players existed in connection with repeated concussive blows to the head, to wit:  the danger of irreversible brain-damage and/or dementia.  Defendants, and each of them, consciously, willfully, and deliberately disregarded the safety of others in continually undertaking to establish and promulgate safety rules for the NFL, but failing to address or disclose this substantial risk, as immediately aforesaid, in connection with such rules, and/or continuing to manufacture, sell, and distribute football helmets which they knew would not protect players against this risk.

### RALPH WENZEL AND ELEANOR PERFETTO

92.     Plaintiff Ralph Wenzel was born on March 13, 1943 in San Mateo, California.  He is married to Eleanor Perfetto.  They live in Annapolis, Maryland.

93.     Plaintiff Ralph Wenzel played for the Pittsburgh Steelers during the 1966 to 1970 seasons, and the San Diego Chargers during the 1971-1973 seasons.

94.     Plaintiff Ralph Wenzel suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

95.     Plaintiff Ralph Wenzel was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

96.     Plaintiff Ralph Wenzel suffers from multiple past traumatic brain injuries with various symptoms including but not limited to, memory loss, headaches, and sleeplessness.

### WOODROW "WOODY" BENNETT

97.     Plaintiff Woodrow Bennett was born on March 24, 1956 in York, Pennsylvania.  He lives in Delray Beach, Florida.

98.     Plaintiff Woodrow Bennett played for the New York Jets during the 1978-1980 seasons, and the Miami Dolphins during the 1980-1988 seasons.

-14-

Ex A_000027

99.     Plaintiff Woodrow Bennett suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

100.     Plaintiff Woodrow Bennett was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

101.     Plaintiff Woodrow Bennett suffers from multiple past traumatic brain injuries with various symptoms including but not limited to, memory loss, headaches, and sleeplessness.

## CAROLYN LENS

102.     Plaintiff Carolyn Lens is the widow of Greg Lens who was born on March 11, 1945 in Marshall, Minnesota.  Greg Lens passed away on November 18, 2009.  Carolyn Lens lives in George West, Texas.

103.     Greg Lens played for the Atlanta Falcons and the Arizona Cardinals during the 1970-1972 seasons.

104.     Greg Lens suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

105.     Greg Lens was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

106.     Greg Lens suffered from multiple past traumatic brain injuries with various symptoms including but not limited to, memory loss, headaches, and sleeplessness, and suffered a premature death as a result of these injuries.

## JOSEPH "BARRY" AND JEAN BROWN

107.     Plaintiff Joseph Brown was born on April 17, 1943 in Boston, Massachusetts.  His is married to Jean Brown.  They live in Rockville, Maryland.

///

-15-

1    108.    Plaintiff Joseph Brown played for the Indianapolis Colts, formerly Baltimore Colts,

2    during the 1966-1967 seasons, the New York Giants during the 1968 season, and the New England

3    Patriots during the 1969-1970 seasons.

4    109.    Plaintiff Joseph Brown suffered multiple concussions that were improperly

5    diagnosed and improperly treated throughout his career as a professional football player in the

6    NFL.

7    110.    Plaintiff Joseph Brown was not warned by the NFL, NFL Properties, Inc., or

8    Riddell Defendants of the risk of long-term injury due to football-related concussions or that the

9    league-mandated equipment did not protect him from such injury. This was a substantial factor in

10   causing his current injury.

11   111.    Plaintiff Joseph Brown suffers from multiple past traumatic brain injuries with

12   various symptoms including but not limited to, memory loss, headaches, and sleeplessness.

13   **JIMMIE GILES**

14   112.    Plaintiff Jimmie Giles was born on November 8, 1954 in Natchez, Mississippi. He

15   lives in Tampa, Florida.

16   113.    Plaintiff Jimmie Giles played for the Tennessee Titans, Formerly the Houston

17   Oilers, during the 1977 season, the Tampa Bay Buccaneers during the 1978-1986 seasons, the

18   Detroit Lions during the 1986-1987 seasons, and the Philadelphia Eagles during the 1987-1989

19   seasons.

20   114.    Plaintiff Jimmie Giles suffered multiple concussions that were improperly

21   diagnosed and improperly treated throughout his career as a professional football player in the

22   NFL.

23   115.    Plaintiff Jimmie Giles was not warned by the NFL, NFL Properties, Inc., or Riddell

24   Defendants of the risk of long-term injury due to football-related concussions or that the league-

25   mandated equipment did not protect him from such injury. This was a substantial factor in causing

26   his current injury.

27   116.    Plaintiff Jimmie Giles suffers from multiple past traumatic brain injuries with

28   various symptoms including but not limited to, memory loss, headaches, and sleeplessness.

-16-

1               **RUDOLPH BUKICH AND PATRICIA BUKICH**

2         117.    Plaintiff Rudolph Bukich was born on March 15, 1932 in St. Louis, Missouri. His

3 is married to Patricia Bukich. They live in Corona, California.

4         118.    Plaintiff Rudolph Bukich played for the Los Angeles Rams during the 1953 and

5 1956 seasons, the Washington Redskins during the 1957-1958 seasons, the Chicago Bears during

6 the 1958-1959 and 1962-1968 seasons, and the Pittsburgh Steelers during the 1960-1961 seasons.

7         119.    Plaintiff Rudolph Bukich suffered multiple concussions that were improperly

8 diagnosed and improperly treated throughout his career as a professional football player in the

9 NFL.

10         120.    Plaintiff Rudolph Bukich was not warned by the NFL, NFL Properties, Inc., or

11 Riddell Defendants of the risk of long-term injury due to football-related concussions or that the

12 league-mandated equipment did not protect him from such injury. This was a substantial factor in

13 causing his current injury.

14         121.    Plaintiff Rudolph Bukich suffers from multiple past traumatic brain injuries with

15 various symptoms including but not limited to, memory loss, headaches, and sleeplessness.

16                             **BRIAN HOLLOWAY**

17         122.    Plaintiff Brian Holloway was born on July 25, 1959 in Omaha, Nebraska. He lives

18 in the State of Florida.

19         123.    Plaintiff Brian Holloway played for the New England Patriots during the 1981-1986

20 seasons and the Los Angeles Raiders during the 1987-1988 seasons.

21         124.    Plaintiff Brian Holloway suffered multiple concussions that were improperly

22 diagnosed and improperly treated throughout his career as a professional football player in the

23 NFL.

24         125.    Plaintiff Brian Holloway was not warned by the NFL, NFL Properties, Inc., or

25 Riddell Defendants of the risk of long-term injury due to football-related concussions or that the

26 league-mandated equipment did not protect him from such injury. This was a substantial factor in

27 causing his current injury.

28

Ex A_000030



126.    Plaintiff Brian Holloway suffers from multiple past traumatic brain injuries with various symptoms including but not limited to, memory loss, headaches, and sleeplessness.

### WAYNE RADLOFF

127.    Plaintiff Wayne Radloff was born on May 17, 1961 in London, England. He lives in Hilton Head Island, South Carolina.

128.    Plaintiff Wayne Radloff played for the and the Atlanta Falcons during the 1985-1989 seasons and the San Francisco 49ers during the 1989-1991 seasons.

129.    Plaintiff Wayne Radloff suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

130.    Plaintiff Wayne Radloff was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury. This was a substantial factor in causing his current injury.

131.    Plaintiff Wayne Radloff suffers from multiple past traumatic brain injuries with various symptoms including but not limited to, memory loss, headaches, and sleeplessness.

### LEE ROY SELMON

132.    Plaintiff Lee Roy Selmon was born on October 20, 1954 in Eufaula, Oklahoma. He lives in Tampa, Florida.

133.    Plaintiff Lee Roy Selmon played for the Tampa Bay Buccaneers during the 1976-1984 seasons.

134.    Plaintiff Lee Roy Selmon suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

135.    Plaintiff Lee Roy Selmon was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury. This was a substantial factor in causing his current injury.

-18-

Ex A_000031

136. Plaintiff Lee Roy Selmon suffers from multiple past traumatic brain injuries with various symptoms including but not limited to, memory loss, headaches, and sleeplessness.

## JOE PHILLIPS

137. Plaintiff Joe Phillips was born on July 15, 1963 in Portland Oregon. He lives in Oregon City, Oregon.

138. Plaintiff Joe Phillips played for the Minnesota Vikings during the 1986 and 1999 seasons, the San Diego Charges during the 1987-1991 seasons, the Kansas City Chiefs during the 1992-1997 seasons, and the St. Louis Rams during the 1998 season.

139. Plaintiff Joe Phillips suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

140. Plaintiff Joe Phillips was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury. This was a substantial factor in causing his current injury.

141. Plaintiff Joe Phillips suffers from multiple past traumatic brain injuries with various symptoms including but not limited to, memory loss, headaches, and sleeplessness.

## MICHAEL CLOUD

142. Plaintiff Michael Cloud was born on July 1, 1975 in Charleston, South Carolina. He lives in Dallas, Texas.

143. Plaintiff Michael Cloud played for the Kansas City Chiefs during the 1999-2002 seasons, the New England Patriots during the 2003 and 2005 seasons, and the New York Giants during the 2004 and 2005 seasons.

144. Plaintiff Michael Cloud suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

145. Plaintiff Michael Cloud was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the

///

-19-

Ex A_000032

1   league-mandated equipment did not protect him from such injury. This was a substantial factor in

2   causing his current injury.

3      146.   Plaintiff Michael Cloud suffers from multiple past traumatic brain injuries with

4   various symptoms including but not limited to, memory loss, headaches, and sleeplessness.

5                     **LARRY BARNES**

6      147.   Plaintiff Larry Barnes was born on July 17, 1954 in Bessemer, Alabama. He lives

7   in Odessa, Florida.

8      148.   Plaintiff Larry Barnes played for the San Diego Chargers during the 1977-1978

9   seasons, the St. Louis Cardinals during the 1978 season, and the Philadelphia Eagles during the

10   1978-1979 seasons.

11      149.   Plaintiff Larry Barnes suffered multiple concussions that were improperly

12   diagnosed and improperly treated throughout his career as a professional football player in the

13   NFL.

14      150.   Plaintiff Larry Barnes was not warned by the NFL, NFL Properties, Inc., or Riddell

15   Defendants of the risk of long-term injury due to football-related concussions or that the league-

16   mandated equipment did not protect him from such injury. This was a substantial factor in causing

17   his current injury.

18      151.   Plaintiff Larry Barnes suffers from multiple past traumatic brain injuries with

19   various symptoms including but not limited to, memory loss, headaches, and sleeplessness.

20                   **JESSE SOLOMON**

21      152.   Plaintiff Jesse Solomon was born on November 4, 1963 in Madison, Florida. He

22   lives in Madison, Florida.

23      153.   Plaintiff Jesse Solomon played for the Minnesota Vikings during the 1986-1989

24   seasons, the Dallas Cowboys during the 1989-1990 seasons, the Tampa Bay Buccaneers during the

25   1991 season, the Atlanta Falcons during the 1992-1993 seasons, and the Miami Dolphins during

26   the 1994 season.

27   ///

28   ///

Ex A_000033

154. Plaintiff Jesse Solomon suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

155. Plaintiff Jesse Solomon was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury. This was a substantial factor in causing his current injury.

156. Plaintiff Jesse Solomon suffers from multiple past traumatic brain injuries with various symptoms including but not limited to, memory loss, headaches, and sleeplessness.

## GREGORY ROBERTS

157. Plaintiff Gregory Roberts was born on November 19, 1956 in Nacogdoches, Texas. He lives in Tampa, Florida.

158. Plaintiff Gregory Roberts played for the Tampa Bay Buccaneers during the 1979-1982 seasons.

159. Plaintiff Gregory Roberts suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

160. Plaintiff Gregory Roberts was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury. This was a substantial factor in causing his current injury.

161. Plaintiff Gregory Roberts suffers from multiple past traumatic brain injuries with various symptoms including but not limited to, memory loss, headaches, and sleeplessness.

## JAMES WILDER

162. Plaintiff James Wilder was born on May 12, 1958 in Sikeston, Missouri. He lives in Tampa, Florida.

///

///

-21-

Ex A_000034

163. Plaintiff James Wilder played for the Tampa Bay Buccaneers during the 1981-1989 seasons, the Washington Redskins during the 1990 season, and the Detroit Lions during the 1990 season.

164. Plaintiff James Wilder suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

165. Plaintiff James Wilder was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury. This was a substantial factor in causing his current injury.

166. Plaintiff James Wilder suffers from multiple past traumatic brain injuries with various symptoms including but not limited to, memory loss, headaches, and sleeplessness.

### SCOT BRANTLEY

167. Plaintiff Scot Brantley was born on February 24, 1958 in Chester, South Carolina. He lives in Tampa, Florida.

168. Plaintiff Scot Brantley played for the Tampa Bay Buccaneers during the 1980-1987 seasons.

169. Plaintiff Scot Brantley suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

170. Plaintiff Scot Brantley was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury. This was a substantial factor in causing his current injury.

### CEDRIC BROWN

171. Plaintiff Cedric Brown was born on May 6, 1954, in Columbus, Ohio. He lives in Oklahoma City, Oklahoma.

///

-22-

Ex A_000035

172.     Plaintiff Cedric Brown played for the Tampa Bay Buccaneers during the 1976-1984 seasons.

173.     Plaintiff Cedric Brown suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

174.     Plaintiff Cedric Brown was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury. This was a substantial factor in causing his current injury.

### DANNY NOONAN

175.     Plaintiff Danny Noonan was born on July 14, 1965 in Lincoln, Nebraska. He lives in Omaha, Nebraska.

176.     Plaintiff Danny Noonan played for the Dallas Cowboys during the 1987-1992 seasons and the Green Bay Packers during the 1992 season.

177.     Plaintiff Danny Noonan suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

178.     Plaintiff Danny Noonan was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury. This was a substantial factor in causing his current injury.

### FIRST CAUSE OF ACTION

### NEGLIGENCE- Monopolist

### (As Against the NFL)

179.     Plaintiffs incorporate by reference paragraphs 1 through 178 of this Complaint as if fully set forth herein at length.

180.     The NFL, by and through its monopoly power, has historically had a duty to invoke rules that protect the health and safety of its players and the public. Nevertheless, by its actions, it

-23-

1    has violated California Business and Professional Code Section 17001 by engaging in practices

2    that restrain the development of good science on the problem and epidemic of concussion injuries.

3        181.   As a monopoly, the NFL has a duty to protect the health and safety of its players, as

4    well as the public at large.

5        182.   Throughout its history, the NFL has consistently breached its duty to protect the

6    health and safety of its players by failing to enact rules, policies and regulations to best protect its

7    players.

8        183.   The NFL breached its duty to its players, including Plaintiffs, to use ordinary care

9    to protect the physical and mental health of players by failing to implement standardized

10   post-concussion guidelines by failing to enact rules to decrease the risk of concussions during

11   games or practices, and by failing to implement mandatory rules that would prevent a player who

12   suffered a mild traumatic brain injury from re-entering a football game and being placed at further

13   risk of injury.

14       184.   Throughout its many years of existence, the NFL, by its own undertakings to act,

15   has repeatedly  established its duty to protect the health and safety of its players when known and

16   foreseeable risk exists. Until August 14, 2007, the NFL failed to create and implement league-wide

17   guidelines concerning the treatment and monitoring of players who suffer concussive brain

18   injuries.

19       185.   It has been well established since 1928 that repeated blows to the head can lead to

20   CTE, commonly known as "punch drunk syndrome." Punch Drunk Syndrome has been prevalent

21   in boxers who have repeatedly suffered concussions.

22       186.   Despite the fact that other sporting associations exist, such as the National Hockey

23   League and the World Boxing Association, which have decades ago established standardized

24   association-wide concussion management rules, until August 14, 2007, the NFL failed to establish

25   any guidelines or policies to protect the mental health and safety of its players.

26       187.   Nonetheless, it took the NFL until June of 2010 to finally acknowledge the long-

27   term risks associated with concussions, including dementia, memory loss, CTE and its related

28   symptoms.   At that time, the NFL warned active players of those risks. To date, the NFL has never

Ex A_000037

1  warned any past players, including Plaintiffs, or the public of the long-term brain injury caused

2  from concussions.

3      188.   The NFL's failure to fulfill its duty to protect its players, the plaintiffs and the

4  public, include, but are not limited to, the following failures:

5      (a)   Failure to institute acclimation requirements or procedures to ensure proper

6          acclimation of the NFL players before they participate in practices or games;

7      (b)   Failure to regulate and monitor practices, games, equipment, and medical care so as

8          to minimize the long-term risks associated with concussive brain injuries suffered

9          by the NFL players, including Plaintiffs;

10     (c)   Failure to require that an adequate concussive brain injury history be taken of NFL

11         players;

12     (d)   Failure to ensure accurate diagnosis and recording of concussive brain injury so the

13         condition can be treated in an adequate and timely manner;

14     (e)   Failure to invoke league-wide guidelines, policies, and procedures regarding the

15         identification and treatment of concussive brain injury;

16     (f)   Failure to properly inform the public and other American Rules Football leagues

17         and players of the health risks associated with concussive injury;

18     (g)   Failure to license and approve the best equipment available that will reduce the risk

19         of concussive brain injury; and

20     (h)   Failure to warn of the harm of repetitive concussion injuries.

21     189.   The NFL breached its duty to protect the health and safety of its players by

22 subjecting NFL players to an increased risk of concussive brain injury.

23     190.   The NFL failed to provide complete, current, and competent information and

24 directions to NFL athletic trainers, physicians, and coaches regarding concussive brain injuries and

25 its prevention, symptoms, and treatment.

26     191.   If the NFL would have taken the necessary steps to oversee and protect the NFL

27 players, including Plaintiffs, by developing and implementing necessary guidelines, policies, and

28 procedures; providing reasonably safe helmets; and educating and training all persons involved

-25-

1    with the NFL Teams in the recognition, prevention, and treatment of concussive brain injuries, the

2    NFL players, such as Plaintiffs, would not have suffered from the subject condition or the effects

3    of that condition, would have recovered more rapidly, or would not have suffered long-term brain

4    injuries.

5          192.    Under all of the above circumstances, it was foreseeable that the NFL's violating its

6    duties would cause or substantially contribute to the personal injuries suffered by Plaintiffs.

7          193.    The NFL committed acts of omission and commission, which collectively and

8    severally, constituted negligence. The NFL's negligence was a proximate and producing cause of

9    the personal injuries and other damages suffered by Plaintiffs.

10         194.    As a result of the personal injuries, Plaintiffs are entitled to damages, as alleged

11   herein or allowed by law, from the NFL in an amount reasonably anticipated to exceed the

12   jurisdictional minimum $25,000.

13                          **SECOND CAUSE OF ACTION:**

14                               **NEGLIGENCE**

15                           **(As Against the NFL)**

16         195.    Plaintiffs incorporate by reference paragraphs 1 through 194 of this Complaint as if

17   fully set forth herein at length.

18         196.    The NFL has historically assumed an independent tort duty to invoke rules that

19   protect the health and safety of its players, but it has violated Section 323 of the Restatement

20   (Second) of Torts as adopted by the Courts in California.

21         197.    Throughout the history of the NFL, the NFL organization has consistently exercised

22   its duty to protect the health and safety of its players by implementing rules, policies and

23   regulations in an attempt to best protect its players.

24         198.    By enacting rules to protect the health and safety of its players, the NFL has

25   repeatedly confirmed its duty to take reasonable and prudent actions to protect the health and safe

26   of its players when known and foreseeable risks exist.

27         199.    The NFL breached its duty to its players, including Plaintiffs, to use ordinary care

28   to protect the physical and mental health of players by implementing standardized post-concussion

Ex A_000039

1  guidelines and by failing to implement mandatory rules that would prevent a layer who suffered a

2  mild traumatic brain injury from re-entering a football game or practice.

3      200.   Throughout the many years that the NFL has repeatedly established its duty to

4  protect the health and safety of its players when known and foreseeable risks exist, until August

5  14, 2007, the NFL failed to create and implement league-wide guidelines concerning the treatment

6  and monitoring of players who suffer a concussive brain injury during a game.

7      201.   It has been well established since 1928 that repeated blows to the head can lead to

8  CTE, commonly known as "punch drunk syndrome." Punch Drunk Syndrome has been prevalent

9  in boxers who have repeatedly suffered concussions.

10      202.   Despite the fact that other sporting associations exist, such as the World Boxing

11  Association, which have decades ago established standardized association-wide concussion

12  management rules, until August 14, 2007, the NFL failed to establish any guidelines or policies to

13  protect the mental health and safety of its players.

14      203.   The NFL's failure to fulfill its assumed duty to protect its players includes but is not

15  limited to the following failures:

16      (a)   Failure to institute acclimation requirements or procedures to ensure proper

17          acclimation of the NFL players before they participate in practices or games;

18      (b)   Failure to regulate and monitor practices, games, rules, equipment, and medical

19          care so as to minimize. the long-term risks associated with concussive brain injuries

20          suffered by the NFL players, including Plaintiffs;

21      (c)   Failure to require that an adequate concussive brain injury history be taken of NFL

22          players;

23      (d)   Failure to ensure accurate diagnosis and recording of concussive brain injury so the

24          condition can be treated in an adequate and timely manner;

25      (e)   Failure to invoke league-wide guidelines, policies, and procedures regarding the

26          identification and treatment of concussive brain injury, and the return to play

27          insofar as such matters pertain to concussive brain injury; and,

28

Ex A_000040

1   (f)     Failure to license and approve the best equipment available that will reduce the risk
2           of concussive brain injury.

3   204.    The NFL breached its assumed duty to protect the health and safety of its players by
4   subjecting NFL players to an increased risk of concussive brain injury.

5   205.    The NFL failed to provide complete, current, and competent information and
6   directions to NFL athletic trainers, physicians, and coaches regarding concussive brain injuries and
7   its prevention, symptoms, and treatment.

8   206.    If the NFL would have taken the necessary steps to oversee and protect the NFL
9   players, including Plaintiffs, by developing and implementing necessary guidelines, policies, and
10  procedures; providing reasonably safe helmets; and educating and training all persons involved
11  with the NFL Teams in the recognition, prevention, and treatment of concussive brain injuries, the
12  NFL players, such as Plaintiffs, would not have suffered from the subject condition or the effects
13  of that condition, would have recovered more rapidly, or would not have suffered long-term brain
14  damage, dementia, and depression related to dementia and CTE.

15  207.    Under all of the above circumstances, it was foreseeable that the NFL's violations
16  of its duties would cause or substantially contribute to the personal injuries suffered by the
17  Plaintiffs.

18  208.    The NFL committed acts of omission and commission, which collectively and
19  severally, constituted negligence. The NFL's negligence was a proximate and producing cause of
20  the personal injuries and other damages suffered by Plaintiff.

21  209.    As a result of the personal injuries of Plaintiffs, they are entitled to damages, as
22  alleged herein or allowed by law, from the NFL m an amount reasonably anticipated to exceed the
23  jurisdictional minimum of $25,000.

24  **THIRD CAUSE OF ACTION:**

25  **FRAUD**

26  **(As Against the NFL)**

27  210.    Plaintiffs incorporate by reference paragraphs 1 through 209 of this Complaint as if
28  fully set forth herein at length.

-28-

Ex A_000041

211. From 2005 through June of 2010, the NFL made through its "Mild Traumatic Brain Injury Committee" and others, its agents, material misrepresentations to its players, former players, the Congress and the public at large that there was no link between concussions and later life cognitive/brain injury, including CTE and its related symptoms.

212. The persons who made the misrepresentations as agents of the NFL and the NFL knew they were false.

213. The persons who made the misrepresentations as agents of the NFL and the NFL intended to defraud, among others, the Plaintiffs in this action.

214. The Plaintiffs, among others, justifiably and reasonably relied on these misrepresentations to their detriment in getting care for their injuries.

215. The Plaintiffs, among others, were damaged by these misrepresentations. Among other things, they require increased home care, loss of consortium, loss of employment, medical costs and pain and suffering.

216. As a result of the personal injuries of Plaintiffs, they are entitled to damages, as alleged. herein or allowed by law, from the NFL in an amount reasonably anticipated to exceed the jurisdictional minimum of $25,000.

## FOURTH CAUSE OF ACTION

## NEGLIGENCE

## (As Against NFL Properties)

217. Plaintiffs incorporate by reference paragraphs 1 through 216 as if fully set forth herein at length.

218. NFL Properties breached its duty to ensure that the equipment it licensed and approved were of the highest possible quality and sufficient to protect the NFL players, including Plaintiffs, from the risk of concussive brain injuries.

219. NFL Properties breached its duty by licensing the Riddell Defendants' helmets, and approving and/or requiring the use of the helmets for the NFL players, knowing or having reason to know that the helmets were negligently and defectively designed and/or manufactured.

-29-

220. As a result of these breaches by NFL Properties, Plaintiffs suffered personal injuries as a result the long-term health effects of concussive brain injuries.

221. As a result of the personal injuries of Plaintiffs, Plaintiffs are entitled to damages from NFL Properties, LLC in an amount reasonably anticipated to exceed the jurisdictional minimum of $25;000.00.

### FIFTH CAUSE OF ACTION

### STRICT LIABILITY FOR DESIGN DEFECT

### (As Against Riddell Defendants)

222. Plaintiffs incorporate by reference paragraphs 1 through 221 of this Complaint as if fully set forth herein at length.

223. At the time the helmets were designed, manufactured, sold, and distributed by the Riddell Defendants, the helmets were defective in design, unreasonably dangerous, and unsafe for their intended purpose because they did not provide adequate protection against the foreseeable risk of concussive brain injury. The design defect includes; but is not limited to the following:

(a) Negligently failing to design the subject helmet with a safe means of attenuating and absorbing the foreseeable forces of impact in order to minimize mid/or reduce the forces and energy directed to the player's head;

(b) Negligently designing the subject helmet with a shock attenuating system which was not safely configured;

(c) Negligently failing to properly and adequately test the helmet model;

(d) Other acts of negligence that may be discovered during the course of this matter; and

(e) Failing to warn Plaintiffs that their helmets would not protect against the long-term health consequences of concussive brain injury.

224. The defective design and unreasonably dangerous condition were a proximate and producing cause of the personal injuries suffered by the Plaintiffs and other damages, including but not limited to, economic damages and non-economic damages.

///

Ex A_000043

225. The Riddell Defendants are strictly liable for designing a defective and unreasonably dangerous product and for failing to warn which were proximate and producing causes of the personal injuries and other damages including, but not limited to, economic damage as alleged herein. A safer alternative design was economically and technologically feasible at the time the product left the control of the Riddell Defendants.

226. As a result of the personal injuries of Plaintiffs, Plaintiffs are entitled to damages from Riddell Defendants in an amount reasonably. anticipated to exceed the jurisdictional minimum of $25,000.00.

## SIXTH CAUSE OF ACTION

## (STRICT LIABILITY FOR MANUFACTURING DEFECT)

### (As Against Riddell Defendants)

227. Plaintiffs incorporate by reference paragraphs 1 through 226 of this Complaint as if fully set forth herein at length.

228. At the time the helmets were designed, manufactured, sold and distributed by the Riddell Defendants, the helmets were defective in their manufacturing and unreasonably dangerous and unsafe for their intended purpose because they did not provide adequate protection against the foreseeable risk of concussive brain injury. The Riddell Defendants' failure to design the helmets to design and manufacturing specifications resulted in, among other things, the following:

(a) Negligently failing to manufacture the subject helmet with a safe means of attenuating and absorbing the foreseeable forces of impact in order to minimize and/or reduce the forces and energy directed to the player's head;

(b) Negligently manufacturing the subject helmet with a shock attenuating system which was not safely configured;

(c) Negligently failing to properly and adequately inspect and/or test the helmet model;

(d) Other acts of negligence that may be discovered during the course of this matter; and

-31-

Ex A_000044

(e)     Failure to warn Plaintiffs that its helmets wouldn't protect against concussive brain injury.

229.     The manufacturing defect was a proximate and producing cause of the personal injuries suffered by Plaintiffs and other damages, including but not limited to, economic damages and non-economic damages.

230.     The Riddell Defendants are strictly liable for manufacturing and placing in the stream of commerce a defective and unreasonably dangerous product which was a proximate and producing cause of the personal injuries and other damages, including but not limited to, economic damages and non-economic damages. A safe alternative design was economically and technologically feasible at the time the product left the control of the Riddell Defendants. As a result of the personal injuries of Plaintiffs, Plaintiffs are entitled to damages from Riddell Defendants in an amount reasonably anticipated to exceed the jurisdictional minimum of $25,000.00.

### SEVENTH CAUSE OF ACTION

### FAILURE TO WARN

### (As Against Riddell Defendants)

231.     Plaintiffs incorporate by reference paragraphs 1 through 230 of this Complaint as if fully set forth herein at length.

232.     The Riddell Defendants failed to provide necessary and adequate safety and instructional materials and warnings of the risk and means available to reduce and/or minimize the risk of concussive brain injuries while playing football.

233.     The Riddell Defendants failed to provide necessary and adequate information, warnings, and/or instructional materials regarding the fact that other model helmets provided greater shock attenuation from blows to the head area.

234.     The Riddell Defendants' failure to warn caused the Plaintiffs' personal injuries.

235.     As a result of the personal injuries of Plaintiffs, Plaintiffs are entitled to damages from the Riddell Defendants in an amount reasonably anticipated to exceed the jurisdictional minimum of $25,000.00.

-32-

Ex A_000045

**EIGHTH CAUSE OF ACTION**

**NEGLIGENCE**

**(As Against Riddell Defendants)**

236.    Plaintiffs incorporate by reference paragraphs 1 through 235 of this Complaint as if fully set forth herein at length.

237.    The Riddell Defendants should have been well aware that since 1928 repeated blows to the head can lead to CTE, commonly known as "punch-drunk syndrome."

238.    The Riddell Defendants breached their duty of reasonable care by failing to provide necessary and adequate safety and instructional materials and warnings of the risk and means available to reduce and/or minimize the risk of concussive brain injuries while playing football using their helmets.

239.    As a result of the Riddell Defendants' breach of duty, Plaintiffs have sustained permanent injury.

240.    For the personal injuries of Plaintiffs, Plaintiffs are entitled to damages from the Riddell Defendants in an amount reasonably anticipated to exceed the jurisdictional minimum of $25,000.00.

**NINTH CAUSE OF ACTION**

**LOSS OF CONSORTIUM**

**(As Against All Defendants)**

241.    Plaintiffs incorporate by reference paragraphs 1 through 240 of this Complaint as if fully set forth herein at length.

242.    As a direct and proximate result of the carelessness, negligence and recklessness of all Defendants and of the aforesaid injuries to their husbands, the wives of Plaintiffs have been damaged as follows:

a.    They have been and will continue to be deprived of the services, society and companionship of their husbands;

b.    They have been and will continue to be required to spend money for medical care and household care for the treatment of their husbands; and

-33-

1     c.     They have been and will continue to be deprived of the earnings of their husbands.

2     243.     As a result of the injuries to Plaintiffs, Plaintiffs' wives are entitled to damages

3 from the Defendants, in an amount reasonably anticipated to exceed the jurisdictional minimum of

4 $25,000.00.

5 ### TENTH CAUSE OF ACTION

6 ### WRONGFUL DEATH

7 ### (As Against All Defendants)

8     244.     Plaintiffs incorporate by reference paragraphs 1 through 243 of this Complaint as if

9 fully set forth herein at length.

10     245.     Greg Lens' (DECEDENT), sole surviving heirs-at-law and their

11 relationships to him are:

12        NAME:                      RELATIONSHIP:

13        Plaintiff, Carolyn Lens           Widow

14     246.     As DECEDENT's heirs, plaintiff, Carolyn Lens, is entitled to bring this

15 action pursuant to Code of Civil Procedure §377.60, subdivision (a).

16     247.     On or about November 18, 2009, having suffered from multiple past

17 traumatic brain injuries while playing professional football for the Atlanta Falcons and the

18 Arizona Cardinals during the 1970-1972 seasons, proximately resulted in his death on

19 November 18, 2009.

20     248.     Plaintiffs allege that defendants knew as early as the 1920's of the potential

21 harmful effects on a player's brain of concussions; however, until June of 2010 they

22 concealed these facts from coaches, trainers, players and the public with negligent

23 disregard for DECEDENT's safety and life. Plaintiffs further allege that defendants'

24 negligence was a direct and proximate cause of DECEDENT's death.

25     249.     As a further direct and proximate result of the hereinabove-described death,

26 DECEDENT's heirs-at-law have been and in the future will be deprived of his society,

27 care, comfort and companionship, all to their general damage in a sum within the

28 jurisdictional limits of this Court.

Ex A_000047

1    250.    Plaintiffs seek prejudgment interest as prescribed by basic California law on

2  any and all damages alleged to have been suffered herein.

3

4                                    **PRAYER FOR RELIEF**

5  **WHEREFORE**, Plaintiffs pray for judgment against Defendants, and each of them, as follows:

6         1.        For compensatory and general damages according to proof;

7         2.        For special and incidental damages according to proof;

8         3.        For punitive damages according to proof;

9         4.        For costs of the proceedings herein; and

10        5.        For all such other and further relief as the Court deems just.

11

12  DATED: ___8/26/11___                            ROSE, KLEIN & MARIAS LLP

13

14

15                                                  By: _____

16                                                       DAVID A. ROSEN
                                                         Attorneys for All Plaintiffs
17

18                                    **JURY DEMAND**

19

20

21     Plaintiffs hereby demand a trial by jury on all claims so triable.

22

23  DATED: ___8/26/11___                            ROSE, KLEIN & MARIAS LLP

24

25

26                                                  By: _____

27                                                       DAVID A. ROSEN
                                                         Attorneys for All Plaintiffs
28

-35-

Ex A_000048

1 │ ROSE, KLEIN & MARIAS LLP
   │ DAVID A. ROSEN (State Bar No. 101287)
2 │ 801 S. Grand Avenue
   │ 11ᵗʰ Floor
3 │ Los Angeles, California 90017-4645
   │ (213) 626-0571
4 │ (213) 623-7755 Fax

5 │ Attorneys for Plaintiffs

6 │

7 │

8 │                    SUPERIOR COURT OF THE STATE OF CALIFORNIA

9 │                         FOR THE COUNTY OF LOS ANGELES

10 │

11 │ LARRY BARNES; WOODROW "WOODY"        ) CASE NO. BC468483
    │ BENNETT; SCOT BRANTLEY; CEDRIC       )
12 │ BROWN; JOSEPH "BARRY" BROWN and      )
    │ JEAN BROWN, his wife; RUDOLPH BUKICH )
13 │ and PATRICIA BUKICH, his wife; MICHAEL ) FIRST AMENDED COMPLAINT
    │ CLOUD; BRIAN HOLLOWAY; JIMMIE        )
14 │ GILES; CAROLYN LENS; DANNY           ) 1.  Negligence - Monopolist
    │ NOONAN; JOE PHILLIPS; GREGORY        ) 2.  Negligence
15 │ ROBERTS; JESSE SOLOMON; RALPH        ) 3.  Fraud
    │ WENZEL and ELEANOR PERFETTO, his     ) 4.  Negligence
16 │ wife; JAMES WILDER; and ROES 1 through ) 5.  Strict Liability - Design Defect
    │ 200, Inclusive,                      ) 6.  Strict Liability - Manufacturing Defect
17 │                                      ) 7.  Failure to Warn
    │              Plaintiffs,             ) 8.  Negligence
18 │                                      ) 9.  Loss of Consortium
    │ v.                                   ) 10. Wrongful Death
19 │                                      )
    │ NATIONAL FOOTBALL LEAGUE; NFL        ) Filed: August 26, 2011
20 │ PROPERTIES LLC; RIDDELL, INC.        )
    │ d.b.a.RIDDELL SPORTS GROUP, INC., ALL )
21 │ AMERICAN SPORTS CORPORATION, d.b.a. )
    │ RIDDELL/ALL AMERICAN; RIDDELL        )
22 │ SPORTS GROUP, INC. EASTON-BELL       )
    │ SPORTS, INC.; EASTON-BELL SPORTS,    )
23 │ LLC; EB SPORTS CORP.; and RBG        )
    │ HOLDINGS CORP.; and DOES 1 through 100, )
24 │ Inclusive,                           )
    │                                      )
25 │              Defendants.             )
    │                                      )
26 │

27 │     The Plaintiffs, all individuals, hereby complain of Defendants, and each of them, listed

28 │ above and hereby allege as follows:

---

FIRST AMENDED COMPLAINT

## PARTIES

**Plaintiffs:**

1.    Mr. Ralph Wenzel and his wife, Eleanor Perfetto, are residents of and are domiciled in the State of Maryland.

2.    Mr. Woodrow Bennett is a resident of and is domiciled in the State of Florida.

3.    Mrs. Carolyn Lens, widow of decedent Greg Lens, is a resident of and is domiciled in the State of Texas.

4.    Mr. Joseph "Barry" Brown and his wife, Jean, are residents of and are domiciled in the State of Maryland.

5.    Mr. Jimmie Giles is a resident of and is domiciled in the State of Florida.

6.    Mr. Rudolph Bukich and his wife, Patricia, are residents of and are domiciled in the State of California.

7.    Mr. Brian Holloway is a resident of and is domiciled in the State of Florida.

8.    Mr. Joe Phillips is a resident of and is domiciled in the State of Oregon.

9.    Michael Cloud is a resident of and is domiciled in the State of Texas.

10.    Larry Barnes is a resident of and is domiciled in the State of Florida.

11.    Jesse Solomon is a resident of and is domiciled in the State of Florida.

12.    Gregory Roberts is a resident of and is domiciled in the State of Florida.

13.    James Wilder is a resident of and is domiciled in the State of Florida.

14.    Scot Brantley is a resident of and is domiciled in the State of Florida.

15.    Cedric Brown is a resident of and is domiciled in the State of Oklahoma.

16.    Danny Noonan is a resident of and is domiciled in the State of Nebraska.

17.    The true names and capacities of plaintiffs ROES 1 through 200, inclusive, are unknown individuals at the present time. When the true names and capacities of said plaintiffs are ascertained, plaintiffs will ask leave of court to amend this complaint by setting forth same.

**Defendants:**

18.    The true names and capacities of defendants DOES 1 through 100, inclusive, whether individual, corporate, associate or otherwise, are unknown to plaintiffs at the present time.

-2-

Ex A_000050

1 | When plaintiffs ascertain such true names and capacities of said defendants, they will ask leave of

2 | court to amend this complaint by setting forth same.

3 |      19.    All defendants, and each of them, were in some fashion legally responsible for the

4 | injuries and damages complained of herein.

5 |      20.    At all times herein mentioned, defendants, and each of them, were the agents,

6 | servants, and employees each of the other, acting within the course and scope of said agency and

7 | employment.

8 |      21.    Defendant National Football League ("the NFL") is an unincorporated association

9 | with its headquarters located in the State of New York.  The NFL regularly conducts business in

10 | California.

11 |      22.    Defendant NFL Properties, LLC as the successor-in-interest to National Football

12 | League Properties, Inc. ("NFL Properties") is a limited liability company organized and existing

13 | under the laws of the State of Delaware with its headquarters in the State of New York.  NFL

14 | Properties is engaged, among other activities, approving licensing and promoting equipment used

15 | by all the NFL teams.  NFL Properties regularly conducts business in California.

16 |      23.    Defendant Riddell, Inc. (d.b.a. Riddell Sports Group, Inc.) is a corporation

17 | organized and existing under the laws of the State of Illinois, and is engaged in the business of

18 | designing, manufacturing, selling and distributing football equipment, including helmets, to the

19 | NFL and since 1989 has been the official helmet of the NFL.  Riddell, Inc. regularly conducts

20 | business in California.

21 |      24.    Defendant All American Sports Corporation, d.b.a. Riddell/All American, is a

22 | corporation organized and existing under the laws of the State of Delaware and is engaged in the

23 | business of designing, manufacturing, selling and distributing football equipment, including

24 | helmets, to the NFL and since 1989 has been the official helmet of the NFL.  All American Sports

25 | regularly conducts business in California.

26 |      25.    Defendant Riddell Sports Group, Inc. is a Delaware corporation with its principal

27 | place of business at 6255 N. State Highway, #300, Irving, TX 76038.  Riddell Sports Group, Inc.

28 | regularly conducts business in California.

-3-

FIRST AMENDED COMPLAINT

26.     Defendant Easton-Bell Sports, Inc., is a California corporation, incorporated in Delaware with a principal place of business at 7855 Haskell Avenue, Suite 200, Van Nuys, CA, 91406 and is a parent corporation of Riddell Sports Group Inc.

27.     Defendant Easton-Bell Sports, LLC is the parent corporation of Easton-Bell Sports, Inc., and is incorporated in Delaware, with a principal place of business at 152 West 57th Street, New York, NY 10019.  Easton-Bell Sports, LLC regularly conducts business in California.

28.     Defendant EB Sports Corp., is a Delaware Corporation with its principal place of business at 7855 Haskell Avenue, Van Nuys, CA 91406.

29.     Defendant RBG Holdings Corp. is a Delaware corporation with its principal place of business at 7855 Haskell Avenue, Suite 350, Van Nuys, CA 91406.

30.     Defendants Riddell, Inc., Riddell Sports Group, Inc., All American Sports Corporation, Easton-Bell Sports, Inc., EB Sports Corp., Easton Bell Sports, LLC, and RBG Holdings Corp., shall hereinafter be referred to collectively as the "Riddell Defendants."

## JURISDICTION AND VENUE

31.     Jurisdiction is based upon the California Constitution Article 6, Section 10.

32.     Venue is proper in this Court pursuant to Section 395(a) of the California Code of Civil Procedure.

## GENERAL ALLEGATIONS AS TO ALL DEFENDANTS

33.     The National Football League consists of two structured conferences, the AFC and the NFC, with 32 team members.

34.     Each team functions as a separate business but operates under shared revenue generated through broadcasting, merchandising and licensing.

35.     The Supreme Court of the United States of America ruled in *American Needle, Inc. v. NFL, et al.* (U.S. 2010) 130 S. Ct. 2201 that the NFL is a separate entity from each of its teams.

36.     The NFL is by far the most attended domestic sports league with an average attendance per game of 67,509 fans in the regular season (2009).

37.     The NFL is a 9 billion dollar-a-year business.

///

-4-

FIRST AMENDED COMPLAINT

### NFL AND THE CBA

38.     Until March of 2011, all NFL players were members of a union called the National Football League Players Association ("NFLPA"). The NFLPA negotiates the general minimum contract for all players in the league with the National Football League Management Council ("NFLMC"). This contract is called the Collective Bargaining Agreement ("CBA") and it is the central document that governs the negotiation of individual player contracts for all of the league's players. However, historically, the NFL retired players have never been the subject of nor a party to Collective Bargaining.

39.     The plaintiffs herein are all retirees and thus not covered by the CBA nor are they a subject of or parties to bargaining between the NFL and the NFLPA. Thus, the plaintiffs' claims are not preempted by federal labor law since any CBA in force does not apply to their claims.

### CTE AND CONCUSSION INJURY

40.     In 2002, Dr. Bennet Omalu, a foresic pathologist and neuropathogist, found Chronic Traumatic Encephalopathy (CTE) in the brain of Hall of Famer, Mike Webster, a former NFL player.

41.     By 2007, Dr. Omalu found a fourth case linking the death of a former NFL player to CTE brain damage from his football career. CTE manifests similarly as in "punch drunk" boxers.

42.     Around the same time, other researchers without NFL ties surveyed retired football players and their findings showed that players who had multiple concussions were more likely to report being diagnosed with depression.

43.     The NFL undertook the responsibility of studying concussion research in 1994 through funding a Committee known as the "NFL Committee on Mild Traumatic Brain Injury."

44.     The NFL Committee on Mild Traumatic Brain Injury published their findings in 2004 showing "no evidence of worsening injury or chronic cumulative effects" from multiple concussions. In a related study, the Committee found "many NFL players can be safely allowed to return to play" on the day of a concussion if they are without symptoms and cleared by a physician.

-5-

45.     As further evidence, Commissioner Roger Goodell in June of 2007 admittedly publicly that the NFL has been studying the effects of traumatic brain injury for "close to 14 years..."

46.     On or about October 28, 2009, Dr. Robert Cantu and Dr. Ann McKee testified before the House of Representatives, Committee on the Judiciary, to discuss the long term impact of football related head injuries.  This was the first instance in which the connection between football head injuries and dementia, memory loss, CTE and related symptoms was disseminated to the public at large.

47.     At no time prior to October 28, 2009 did any Plaintiff to this action have knowledge of the connection between football head injuries and dementia, memory loss, CTE and related symptoms.

48.     It was not until June of 2010 that the NFL publicly acknowledged that concussions can lead to dementia, memory loss, CTE and related symptoms by publishing warning to every player and team.

### NFL'S DUTY TO PLAYERS AND THE PUBLIC

49.     The NFL overtly undertook a duty to study concussions on behalf of all American Rules Football leagues and players.

50.     All American Rules Football leagues modeled their programs after the NFL.

51.     In turn, the NFL possesses monopoly power over American Football.  As such, it also possesses monopoly power over the research and education of football injuries to physicians, trainers, coaches and individuals with brain damage such as Plaintiffs who played in the NFL, as well as the public at large.  As a result, it owed a duty to everyone including individuals such as Plaintiffs in the following respects:

(a)     It owed a duty of reasonable care to protect Plaintiffs on the playing field;

(b)     It owed a duty of reasonable care to Plaintiffs to educate them and other players in the NFL about CTE and/or concussion injury;

(c)     It owed a duty of reasonable care to Plaintiffs to educate trainers, physicians, and coaches about CTE and/or concussion injury;

-6-

(d) It owed a duty of reasonable care to Plaintiffs to have in place strict return-to-play guidelines to prevent CTE and/or concussion injury;

(e) It owed a duty of reasonable care to Plaintiffs to promote a "whistleblower" system where teammates would bring to the attention of a trainer, physician or coach that another player had sustained concussion injury;

(f) It owed a duty of reasonable care to Plaintiffs to design rules and penalties for players who use their head or upper body to hit or tackle;

(g) It owed a duty of reasonable care to Plaintiffs to design rules to eliminate the risk of concussion during games and/or practices;

(h) It owed a duty of reasonable care to Plaintiffs to promote research into and cure for CTE and the effects of concussion injury over a period of time; and

(i) It owed a duty of reasonable care to State governments, local sports organizations, all American Rules Football leagues and players, and the public at large to protect against the long-term effects of CTE and/or concussion injury.

52. The NFL knew as early as the 1920's of the potential harmful effects on a player's brain of concussions; however, until June of 2010 they concealed these facts from coaches, trainers, players and the public.

53. Prior to June 2010, Plaintiffs did not know, nor did they have reason to know, the long-term effects of concussions and relied on the NFL and the Riddell Defendants to protect them.

## NFL'S KNOWLEDGE OF THE RISK OF CONCUSSIONS

54. For decades, Defendants have known that multiple blows to the head can lead to long-term brain injury, including memory loss, dementia, depression and CTE and its related symptoms.

55. This action arises from the Defendants' failure to warn and protect NFL players, such as Plaintiffs, against the long-term brain injury risks associated with football-related concussions.

///

-7-

56.     This action arises because while the NFL Defendants undertook to investigate, research, and promulgate multiple safety rules, the NFL Defendants committed negligence by failing to act reasonably and exercise their duty to enact league-wide guidelines and mandatory rules regulating post-concussion medical treatment and return-to-play standards for players who suffer a concussion and/or multiple concussions.

57.     By failing to exercise its duty to enact reasonable and prudent rules to protect players against the risks associated with repeated brain trauma, the NFL's failure to exercise its independent duty has led to the deaths of some, and brain injuries of many other former players.

58.     Throughout the past century and through the present, the published frank medical literature in the United States and other industrialized countries has included case reports, studies, reviews, and peer-reviewed articles relating to and discussing the harmful effect on humans, and particularly players of American football, of repeated concessive blows to the head.  These publications were all available and easily accessible to all Defendants.

59.     The NFL's ongoing undertaking to protect the health and safety of the players is evidenced by the NFL's enactment of at least the following non-exhaustive list of rules pertaining to players' health and safety, particularly relating to blows to the head:

(a)     In 1956, the NFL enacted a rule that prohibited the grabbing of any player's facemask, other than the ball carrier;

(b)     In 1962, the NFL enacted a rule that prohibited players from grabbing any player's facemask;

(c)     In 1976, the NFL enacted a rule that prohibited players from grabbing the facemask of an opponent.  The penalty for an incidental grasp of the facemask was 5 yards.  The penalty for twisting, turning, or pulling the facemask was 15 yards.  A player could be ejected from the game if the foul is judged to be vicious and/or flagrant;

(d)     In 1977, the NFL enacted a rule that prohibited players from slapping the head of another playing during play.  This rule was referred to as the "Deacon Jones Rule," named after the Rams' defensive end who frequently used this technique;

-8-

(e)    In 1977, the NFL enacted a rule that prohibited Offensive Lineman from thrusting their hands into a defender's neck, face, or head;

(f)    In 1979, the NFL enacted a rule that prohibited players from using their helmets to butt, spear, or ram an opponent.  Pursuant to this rule, any player who used the crown or top of his helmet unnecessarily will be called for unnecessary roughness;

(g)    In 1980, the NFL enacted rule changes that provided greater restrictions on contact in the area of the head, neck, and face;

(h)    In 1980, the NFL enacted rule changes that prohibited players from directly striking, swinging, or clubbing the head, neck, or face ("personal foul").  Beginning in 1980, a penalty could be called for such contact whether or not the initial contact was made below the neck area;

(i)    In 1982, the NFL enacted a rule change by which the penalty for incidental grabbing of a facemask by a defensive team was changed from 5 yards to an automatic first down plus a 5 yard penalty;

(j)    In 1983, the NFL enacted a rule that prohibited players from using a helmet as a weapon to strike or hit an opponent;

(k)    In 1988, the NFL enacted a rule that prohibited defensive players from hitting quarterbacks below the waist while they are still in the pocket.  (The rule was unofficially called the "Andre Waters Rule" based upon a hit that Waters placed on Los Angeles Rams quarterback Jim Everett in 1988); and

(l)    Following the 2004-2005 season, the NFL's Competition Committee reviewed video of the entire season and concluded that the horse-collar tackle resulted in six serious injuries.  On May 23, 2005, the NFL owners voted 27-5 to ban such tackles.  The ban states that a horse-collar tackle is an open-field tackle in which a defender uses the shoulder pads to immediately bring a ball carrier down.

## NFL FRAUDULENTLY CONCEALED
## THE LONG-TERM EFFECTS OF CONCUSSIONS

-9-

Ex A_000057

60. Instead of taking measures to actually protect its players from suffering long-term brain injuries, the NFL created the "Mild Traumatic Brain Injury Committee" in 1994 to purportedly study the effects of concussions on NFL players.

61. The Mild Traumatic Brain Injury Committee was chaired by Dr. Elliot Pellman, a rheumatologist who is not certified as to brain injuries and/or concussions.

62. After 14 years of purported studies, and after numerous medical journal articles were written by the NFL's Mild Traumatic Brain Injury Committee (the "NFL's Brain Injury, Committee"), concluded that "[b]ecause a significant percentage of players returned to play in the same game [as they suffered a mild traumatic brain injury] and the overwhelming majority of players with concussions were kept out of football-related activities for less than 1 week, it can be concluded that mild TBI's in professional football are not serious injuries." See "Concussion in professional football: Summary of the research conducted by the National Football League's Committee on Mild Traumatic Brain Injury," *Neurosurg Focus* 21 (4):E12; 2006, RI. Pellman and D.C. Viano.

63. According to the NFL's own committee, the speedy return to play after suffering a concussion demonstrates that such players were not at a greater risk of suffering long-term brain injury.

64. The NFL-funded study is completely devoid of logic and science. More importantly, it is contrary to their Health and Safety Rules as well as 75 years of published medical literature on concussions.

65. Between 2002 and 2005, a series of clinical and neuropathological studies performed by independent scientists and physicians demonstrated that multiple NFL induced-concussions cause cognitive problems such as depression, early on-set dementia and CTE and its related symptoms.

66. In response to these studies, the NFL, to further a scheme of fraud and deceit, had members of the NFL's Brain Injury Committee deny knowledge of a link between concussion and cognitive decline and claim that more time was needed to reach a definitive conclusion on the issue.

67. When the NFL's Brain Injury Committee anticipated studies that would implicate causal links between concussion and cognitive degeneration it promptly published articles producing contrary findings, although false, distorted and deceiving as part of the NFL's scheme to deceive Congress, the players and the public at large.

68. Between 2002 and 2007, Dr. Bennet Omalu examined the brain tissue of deceased NFL players including Mike Webster, Terry Long, Andrew Waters and Justin Strzelczyk. Dr. Omalu in an article in *Neurosurgery* concluded that chronic traumatic encephalopathy ("CTE") triggered by multiple NFL concussions represented a partial cause of their deaths.

69. In response to Dr. Omalu's article, the NFL acting thru the NFL's Brain Injury Committee, Drs. Ira Casson, Elliott Pellman and David Viano wrote a letter to the editor of *Neurosurgery* asking that Dr. Omalu's article be retracted.

70. In 2005, a clinical study performed by Dr. Kevin Guskiewicz found that retired players who sustained three or more concussions in the NFL had a five-fold prevalence of mild cognitive impairment. The NFL's Brain Injury Committee, Dr. Mark Lowell, promptly attacked the article by refusing to accept a survey of 2,400 former NFL players.

71. Because of Congressional scrutiny and media pressure, the NFL scheduled a league-wide Concussion Summit for June 2007. Unfortunately, the NFL in keeping with its scheme of fraud and deceit issued a pamphlet to players in August 2007, which stated: "there is no magic number for how many concussions is too many."

72. When Boston University's Dr. Ann McKee found CTE in the brains two more deceased NFL players in 2008, Dr. Ira Casson characterized each study as an "isolated incident" from which no conclusion could be drawn.

73. At the October 2009 Congressional hearings of the House Judiciary Committee, committee member Linda Sanchez (D-CA) analogized the NFL's denial of a causal link between NFL concussion and cognitive decline to the Tobacco industry's denial of the link between cigarette consumption and ill health effects.

74. Since at least 2002, the NFL Committee has been on direct notice of multiple NFL head injuries contributing to cognitive decline in later life, yet it has never amended the 2007

-11-

NFL's Brain Injury Committee statement: "Current research with professional athletes has not shown that having more than one or two concussions leads to permanent problems ... It is important to understand that there is no magic number for how many concussions is too many."

75. As of June 2010, the NFL had yet to amend these inaccurate and misrepresentative statements to any Plaintiff or retiree.

## THE NFL ACKNOWLEDGES THEIR DUTY TO PROTECT AGAINST
## THE LONG-TERM RISK OF CONCUSSIONS

76. On August 14, 2007, the NFL acknowledged its duty to players by enacting rules to protect them against the risks associated with repeated brain trauma.

77. The NFL's 2007 concussion guidelines, many of which stemmed from an NFL conference in June of 2007 involving team trainers and doctors, were sent to all current players and other team personnel.

78. The NFL's 2007 guidelines on concussion management include a whistle-blower provision for individuals to report concussions with the league so that a player with a head injury is not forced to practice or play against medical advice.

79. The NFL's 2007 concussion guidelines also include an informational pamphlet provided to all current NFL players to aid in identifying symptoms of a concussion. This information was later withdrawn by one of the outside counsel of the NFL in a separate letter to its disability plan, as well as the NFL's August 14, 2007 press release denying that "more than one or two concussions leads to permanent problems."

80. In a statement issued by the NFL on August 14, 2007, Roger Goodell, the Commissioner of the NFL, introduced the NFL's 2007 concussion guidelines by saying, "We want to make sure all NFL players, coaches and staff members are fully informed and take advantage of the most up-to-date information and resources as we continue to study the long-term impact of concussions."

81. The NFL's Commissioner also stated, "[b]ecause of the unique and complex nature of the brain, our goal is to continue to have concussions managed conservatively by outstanding medical personnel in a way that clearly emphasizes player safety over competitive concerns."

-12-

Ex A_000060

82.    The NFL's 2007 concussion guidelines provide when a player with a concussion can return to a game or practice.

83.    The NFL's 2007 concussion guidelines specifically mandate that a player should. The NFL's 2007 concussion guidelines specifically mandate that a player should have no concussion symptoms and normal neurological test results before returning to play.

84.    For the past many decades until August 14, 2007, the NFL's duty to protect its players has never changed and has, ever waned.  The only change that occurred is that on August 14, 2007, the NFL finally and unequivocally acted upon its longstanding players by implementing league-wide concussion guidelines.

85.    Importantly, the NFL themselves acknowledged that the 2007 guidelines were inadequate and insufficient. As a result, the NFL enacted more strict regulations to handle concussions starting in the 2009 season. Specifically, the NFL announced new rules on managing concussions requiring players who exhibit any significant concussion signs to be removed from a game or practice and be barred from returning the same day.

86.    Nevertheless; it was not until June of 2010 that the NFL warned any player of the long-term risks associated with multiple concussions, including dementia, memory loss, CTE and its related symptoms. The Riddell Defendants also failed to so warn active players until approximately the same time frame.

87.    As of today, the NFL Defendants and the Riddell Defendants have never warned any Plaintiff or retired player of the long-term health effects of concussions.

**THE DEFENDANTS' CONDUCT RISES BEYOND MERE NEGLIGENCE**

88.    The aforementioned acts and omissions of the Defendants demonstrate that the Defendants acted with callous indifference to the rights and duties owed to Plaintiffs, all American Rules Football leagues and players and the public at large.

89.    The Defendants acted wilfully, wantonly, egregiously, with reckless abandon, and with a high degree of moral culpability.  Defendants, and each of them, knew that a substantial risk of physical and mental harm to NFL players existed in connection with repeated concussive blows to the head, to wit:  the danger of irreversible brain-damage and/or dementia.  Defendants, and

-13-

Ex A_000061

1   each of them, consciously, willfully, and deliberately disregarded the safety of others in

2   continually undertaking to establish and promulgate safety rules for the NFL, but failing to address

3   or disclose this substantial risk, as immediately aforesaid, in connection with such rules, and/or

4   continuing to manufacture, sell, and distribute football helmets which they knew would not protect

5   players against this risk.

6                 **RALPH WENZEL AND ELEANOR PERFETTO**

7       90.   Plaintiff Ralph Wenzel was born on March 13, 1943 in San Mateo, California. He

8   is married to Eleanor Perfetto. They live in Annapolis, Maryland.

9       91.   Plaintiff Ralph Wenzel played for the Pittsburgh Steelers during the 1966 to 1970

10   seasons, and the San Diego Chargers during the 1971-1973 seasons.

11       92.   Plaintiff Ralph Wenzel suffered multiple concussions that were improperly

12   diagnosed and improperly treated throughout his career as a professional football player in the

13   NFL.

14       93.   Plaintiff Ralph Wenzel was not warned by the NFL, NFL Properties, Inc., or

15   Riddell Defendants of the risk of long-term injury due to football-related concussions or that the

16   league-mandated equipment did not protect him from such injury. This was a substantial factor in

17   causing his current injury.

18       94.   Plaintiff Ralph Wenzel suffers from multiple past traumatic brain injuries with

19   various symptoms including but not limited to, memory loss, headaches, and sleeplessness.

20                 **WOODROW "WOODY" BENNETT**

21       95.   Plaintiff Woodrow Bennett was born on March 24, 1956 in York, Pennsylvania.

22   He lives in Delray Beach, Florida.

23       96.   Plaintiff Woodrow Bennett played for the New York Jets during the 1978-1980

24   seasons, and the Miami Dolphins during the 1980-1988 seasons.

25       97.   Plaintiff Woodrow Bennett suffered multiple concussions that were improperly

26   diagnosed and improperly treated throughout his career as a professional football player in the

27   NFL.

28   ///

-14-

FIRST AMENDED COMPLAINT

98.    Plaintiff Woodrow Bennett was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

99.    Plaintiff Woodrow Bennett suffers from multiple past traumatic brain injuries with various symptoms including but not limited to, memory loss, headaches, and sleeplessness.

### CAROLYN LENS

100.    Plaintiff Carolyn Lens is the widow of Greg Lens who was born on March 11, 1945 in Marshall, Minnesota.  Greg Lens passed away on November 18, 2009.  Carolyn Lens lives in George West, Texas.

101.    Greg Lens played for the Atlanta Falcons and the Arizona Cardinals during the 1970-1972 seasons.

102.    Greg Lens suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

103.    Greg Lens was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

104.    Greg Lens suffered from multiple past traumatic brain injuries with various symptoms including but not limited to, memory loss, headaches, and sleeplessness, and suffered a premature death as a result of these injuries.

### JOSEPH "BARRY" AND JEAN BROWN

105.    Plaintiff Joseph Brown was born on April 17, 1943 in Boston, Massachusetts.  His is married to Jean Brown.  They live in Rockville, Maryland.

106.    Plaintiff Joseph Brown played for the Indianapolis Colts, formerly Baltimore Colts, during the 1966-1967 seasons, the New York Giants during the 1968 season, and the New England Patriots during the 1969-1970 seasons.

-15-

Ex A_000063

107.    Plaintiff Joseph Brown suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

108.    Plaintiff Joseph Brown was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

109.    Plaintiff Joseph Brown suffers from multiple past traumatic brain injuries with various symptoms including but not limited to, memory loss, headaches, and sleeplessness.

### JIMMIE GILES

110.    Plaintiff Jimmie Giles was born on November 8, 1954 in Natchez, Mississippi.  He lives in Tampa, Florida.

111.    Plaintiff Jimmie Giles played for the Tennessee Titans, Formerly the Houston Oilers, during the 1977 season, the Tampa Bay Buccaneers during the 1978-1986 seasons, the Detroit Lions during the 1986-1987 seasons, and the Philadelphia Eagles during the 1987-1989 seasons.

112.    Plaintiff Jimmie Giles suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

113.    Plaintiff Jimmie Giles was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

114.    Plaintiff Jimmie Giles suffers from multiple past traumatic brain injuries with various symptoms including but not limited to, memory loss, headaches, and sleeplessness.

### RUDOLPH BUKICH AND PATRICIA BUKICH

115.    Plaintiff Rudolph Bukich was born on March 15, 1932 in St. Louis, Missouri.  His is married to Patricia Bukich.  They live in Corona, California.

-16-

116.    Plaintiff Rudolph Bukich played for the Los Angeles Rams during the 1953 and 1956 seasons, the Washington Redskins during the 1957-1958 seasons, the Chicago Bears during the 1958-1959 and 1962-1968 seasons, and the Pittsburgh Steelers during the 1960-1961 seasons.

117.    Plaintiff Rudolph Bukich suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

118.    Plaintiff Rudolph Bukich was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

119.    Plaintiff Rudolph Bukich suffers from multiple past traumatic brain injuries with various symptoms including but not limited to, memory loss, headaches, and sleeplessness.

### BRIAN HOLLOWAY

120.    Plaintiff Brian Holloway was born on July 25, 1959 in Omaha, Nebraska.  He lives in the State of Florida.

121.    Plaintiff Brian Holloway played for the New England Patriots during the 1981-1986 seasons and the Los Angeles Raiders during the 1987-1988 seasons.

122.    Plaintiff Brian Holloway suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

123.    Plaintiff Brian Holloway was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

124.    Plaintiff Brian Holloway suffers from multiple past traumatic brain injuries with various symptoms including but not limited to, memory loss, headaches, and sleeplessness.

///

///

-17-

## JOE PHILLIPS

125.    Plaintiff Joe Phillips was born on July 15, 1963 in Portland Oregon.  He lives in Oregon City, Oregon.

126.    Plaintiff Joe Phillips played for the Minnesota Vikings during the 1986 and 1999 seasons, the San Diego Charges during the 1987-1991 seasons, the Kansas City Chiefs during the 1992-1997 seasons, and the St. Louis Rams during the 1998 season.

127.    Plaintiff Joe Phillips suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

128.    Plaintiff Joe Phillips was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

129.    Plaintiff Joe Phillips suffers from multiple past traumatic brain injuries with various symptoms including but not limited to, memory loss, headaches, and sleeplessness.

## MICHAEL CLOUD

130.    Plaintiff Michael Cloud was born on July 1, 1975 in Charleston, South Carolina. He lives in Dallas, Texas.

131.    Plaintiff Michael Cloud played for the Kansas City Chiefs during the 1999-2002 seasons, the New England Patriots during the 2003 and 2005 seasons, and the New York Giants during the 2004 and 2005 seasons.

132.    Plaintiff Michael Cloud suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

133.    Plaintiff Michael Cloud was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

-18-

Ex A_000066

134.    Plaintiff Michael Cloud suffers from multiple past traumatic brain injuries with various symptoms including but not limited to, memory loss, headaches, and sleeplessness.

## LARRY BARNES

135.    Plaintiff Larry Barnes was born on July 17, 1954 in Bessemer, Alabama. He lives in Odessa, Florida.

136.    Plaintiff Larry Barnes played for the San Diego Chargers during the 1977-1978 seasons, the St. Louis Cardinals during the 1978 season, and the Philadelphia Eagles during the 1978-1979 seasons.

137.    Plaintiff Larry Barnes suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

138.    Plaintiff Larry Barnes was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury. This was a substantial factor in causing his current injury.

139.    Plaintiff Larry Barnes suffers from multiple past traumatic brain injuries with various symptoms including but not limited to, memory loss, headaches, and sleeplessness.

## JESSE SOLOMON

140.    Plaintiff Jesse Solomon was born on November 4, 1963 in Madison, Florida. He lives in Madison, Florida.

141.    Plaintiff Jesse Solomon played for the Minnesota Vikings during the 1986-1989 seasons, the Dallas Cowboys during the 1989-1990 seasons, the Tampa Bay Buccaneers during the 1991 season, the Atlanta Falcons during the 1992-1993 seasons, and the Miami Dolphins during the 1994 season.

142.    Plaintiff Jesse Solomon suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

///

-19-

Ex A_000067

143. Plaintiff Jesse Solomon was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury. This was a substantial factor in causing his current injury.

144. Plaintiff Jesse Solomon suffers from multiple past traumatic brain injuries with various symptoms including but not limited to, memory loss, headaches, and sleeplessness.

## GREGORY ROBERTS

145. Plaintiff Gregory Roberts was born on November 19, 1956 in Nacogdoches, Texas. He lives in Tampa, Florida.

146. Plaintiff Gregory Roberts played for the Tampa Bay Buccaneers during the 1979-1982 seasons.

147. Plaintiff Gregory Roberts suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

148. Plaintiff Gregory Roberts was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury. This was a substantial factor in causing his current injury.

149. Plaintiff Gregory Roberts suffers from multiple past traumatic brain injuries with various symptoms including but not limited to, memory loss, headaches, and sleeplessness.

## JAMES WILDER

150. Plaintiff James Wilder was born on May 12, 1958 in Sikeston, Missouri. He lives in Tampa, Florida.

151. Plaintiff James Wilder played for the Tampa Bay Buccaneers during the 1981-1989 seasons, the Washington Redskins during the 1990 season, and the Detroit Lions during the 1990 season.

///

///

-20-

1  152.  Plaintiff James Wilder suffered multiple concussions that were improperly
2  diagnosed and improperly treated throughout his career as a professional football player in the
3  NFL.

4  153.  Plaintiff James Wilder was not warned by the NFL, NFL Properties, Inc., or Riddell
5  Defendants of the risk of long-term injury due to football-related concussions or that the league-
6  mandated equipment did not protect him from such injury.  This was a substantial factor in causing
7  his current injury.

8  154.  Plaintiff James Wilder suffers from multiple past traumatic brain injuries with
9  various symptoms including but not limited to, memory loss, headaches, and sleeplessness.

10  **SCOT BRANTLEY**

11  155.  Plaintiff Scot Brantley was born on February 24, 1958 in Chester, South Carolina.
12  He lives in Tampa, Florida.

13  156.  Plaintiff Scot Brantley played for the Tampa Bay Buccaneers during the 1980-1987
14  seasons.

15  157.  Plaintiff Scot Brantley suffered multiple concussions that were improperly
16  diagnosed and improperly treated throughout his career as a professional football player in the
17  NFL.

18  158.  Plaintiff Scot Brantley was not warned by the NFL, NFL Properties, Inc., or Riddell
19  Defendants of the risk of long-term injury due to football-related concussions or that the league-
20  mandated equipment did not protect him from such injury.  This was a substantial factor in causing
21  his current injury.

22  159.  Plaintiff Scot Brantley suffers from multiple past traumatic brain injuries with
23  various symptoms including but not limited to, memory loss, headaches, and sleeplessness.

24  **CEDRIC BROWN**

25  160.  Plaintiff Cedric Brown was born on May 6, 1954, in Columbus, Ohio.  He lives in
26  Oklahoma City, Oklahoma.

27  161.  Plaintiff Cedric Brown played for the Tampa Bay Buccaneers during the 1976-1984
28  seasons.

-21-

FIRST AMENDED COMPLAINT

162.   Plaintiff Cedric Brown suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

163.   Plaintiff Cedric Brown was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

164.   Plaintiff Cedric Brown suffers from multiple past traumatic brain injuries with various symptoms including but not limited to, memory loss, headaches, and sleeplessness.

### DANNY NOONAN

165.   Plaintiff Danny Noonan was born on July 14, 1965 in Lincoln, Nebraska.  He lives in Omaha, Nebraska.

166.   Plaintiff Danny Noonan played for the Dallas Cowboys during the 1987-1992 seasons and the Green Bay Packers during the 1992 season.

167.   Plaintiff Danny Noonan suffered multiple concussions that were improperly diagnosed and improperly treated throughout his career as a professional football player in the NFL.

168.   Plaintiff Danny Noonan was not warned by the NFL, NFL Properties, Inc., or Riddell Defendants of the risk of long-term injury due to football-related concussions or that the league-mandated equipment did not protect him from such injury.  This was a substantial factor in causing his current injury.

169.   Plaintiff Cedric Brown suffers from multiple past traumatic brain injuries with various symptoms including but not limited to, memory loss, headaches, and sleeplessness.

### FIRST CAUSE OF ACTION

### NEGLIGENCE- Monopolist

### (As Against the NFL)

170.   Plaintiffs incorporate by reference paragraphs 1 through 174 of this Complaint as if fully set forth herein at length.

-22-

FIRST AMENDED COMPLAINT

Ex A_000070

171.    The NFL, by and through its monopoly power, has historically had a duty to invoke rules that protect the health and safety of its players and the public. Nevertheless, by its actions, it has violated California Business and Professional Code Section 17001 by engaging in practices that restrain the development of good science on the problem and epidemic of concussion injuries.

172.    As a monopoly, the NFL has a duty to protect the health and safety of its players, as well as the public at large.

173.    Throughout its history, the NFL has consistently breached its duty to protect the health and safety of its players by failing to enact rules, policies and regulations to best protect its players.

174.    The NFL breached its duty to its players, including Plaintiffs, to use ordinary care to protect the physical and mental health of players by failing to implement standardized post-concussion guidelines by failing to enact rules to decrease the risk of concussions during games or practices, and by failing to implement mandatory rules that would prevent a player who suffered a mild traumatic brain injury from re-entering a football game and being placed at further risk of injury.

175.    Throughout its many years of existence, the NFL, by its own undertakings to act, has repeatedly  established its duty to protect the health and safety of its players when known and foreseeable risk exists. Until August 14, 2007, the NFL failed to create and implement league-wide guidelines concerning the treatment and monitoring of players who suffer concussive brain injuries.

176.    It has been well established since 1928 that repeated blows to the head can lead to CTE, commonly known as "punch drunk syndrome." Punch Drunk Syndrome has been prevalent in boxers who have repeatedly suffered concussions.

177.    Despite the fact that other sporting associations exist, such as the National Hockey League and the World Boxing Association, which have decades ago established standardized association-wide concussion management rules, until August 14, 2007, the NFL failed to establish any guidelines or policies to protect the mental health and safety of its players.

///

-23-

178.    Nonetheless, it took the NFL until June of 2010 to finally acknowledge the long-term risks associated with concussions, including dementia, memory loss, CTE and its related symptoms.   At that time, the NFL warned active players of those risks. To date, the NFL has never warned any past players, including Plaintiffs, or the public of the long- term brain injury caused from concussions.

179.    The NFL's failure to fulfill its duty to protect its players, the plaintiffs and the public, include, but are not limited to, the following failures:

(a)    Failure to institute acclimation requirements or procedures to ensure proper acclimation of the NFL players before they participate in practices or games;

(b)    Failure to regulate and monitor practices, games, equipment, and medical care so as to minimize the long-term risks associated with concussive brain injuries suffered by the NFL players, including Plaintiffs;

(c)    Failure to require that an adequate concussive brain injury history be taken of NFL players;

(d)    Failure to ensure accurate diagnosis and recording of concussive brain injury so the condition can be treated in an adequate and timely manner;

(e)    Failure to invoke league-wide guidelines, policies, and procedures regarding the identification and treatment of concussive brain injury;

(f)    Failure to properly inform the public and other American Rules Football leagues and players of the health risks associated with concussive injury;

(g)    Failure to license and approve the best equipment available that will reduce the risk of concussive brain injury; and

(h)    Failure to warn of the harm of repetitive concussion injuries.

180.    The NFL breached its duty to protect the health and safety of its players by subjecting NFL players to an increased risk of concussive brain injury.

181.    The NFL failed to provide complete, current, and competent information and directions to NFL athletic trainers, physicians, and coaches regarding concussive brain injuries and its prevention, symptoms, and treatment.

-24-

FIRST AMENDED COMPLAINT

182.     If the NFL would have taken the necessary steps to oversee and protect the NFL players, including Plaintiffs, by developing  and implementing necessary guidelines, policies, and procedures; providing reasonably safe helmets; and educating and training all persons involved with the NFL Teams in the recognition, prevention, and treatment of concussive brain injuries, the NFL players, such as Plaintiffs, would not have suffered from the subject condition or the effects of that condition, would have recovered more rapidly, or would not have suffered long-term brain injuries.

183.     Under all of the above circumstances, it was foreseeable that the NFL's violating its duties would cause or substantially contribute to the personal injuries suffered by Plaintiffs.

184.     The NFL  committed acts of omission and commission, which collectively and severally, constituted negligence. The NFL's negligence was a proximate and producing cause of the personal injuries and other damages suffered by Plaintiffs.

185.     As a result of the personal injuries, Plaintiffs are entitled to damages, as alleged herein or allowed by law, from the NFL in an amount reasonably anticipated to exceed the jurisdictional minimum $25,000.

## SECOND CAUSE OF ACTION:

## NEGLIGENCE

### (As Against the NFL)

186.     Plaintiffs incorporate by reference paragraphs 1 through 190 of this Complaint as if fully set forth herein at length.

187.     The NFL has historically assumed an independent tort duty to invoke rules that protect the health and safety of its players, but it has violated Section 323 of the Restatement (Second) of Torts as adopted by the Courts in California.

188.     Throughout the history of the NFL, the NFL organization has consistently exercised its duty to protect the health and safety of its players by implementing rules, policies and regulations in an attempt to best protect its players.

///

///

-25-

Ex A_000073

189.   By enacting rules to protect the health and safety of its players, the NFL has repeatedly confirmed its duty to take reasonable and prudent actions to protect the health and safe of its players when known and foreseeable risks exist.

190.   The NFL breached its duty to its players, including Plaintiffs, to use ordinary care to protect the physical and mental health of players by implementing standardized post-concussion guidelines  and by failing to implement mandatory rules that would prevent a layer who suffered a mild traumatic brain injury from re-entering a football game or practice.

191.   Throughout the many years that the NFL has repeatedly established its duty to protect the health and safety of its players when known and foreseeable risks exist, until August 14, 2007, the NFL failed to create and implement league-wide guidelines concerning the treatment and monitoring of players who suffer a concussive brain injury during a game.

192.   It has been well established since 1928 that repeated blows to the head can lead to CTE, commonly known as "punch drunk syndrome." Punch Drunk Syndrome has been prevalent in boxers who have repeatedly suffered concussions.

193.   Despite the fact that other sporting associations exist, such as the World Boxing Association, which have decades ago established standardized association-wide concussion management rules, until August 14, 2007, the NFL failed to establish any guidelines or policies to protect the mental health and safety of its players.

194.   The NFL's failure to fulfill its assumed duty to protect its players includes but is not limited to the following failures:

(a)   Failure to institute acclimation requirements or procedures to ensure proper acclimation of the NFL players before they participate in practices or games;

(b)   Failure to regulate and monitor practices, games, rules, equipment, and medical care so as to minimize. the long-term risks associated with concussive brain injuries suffered by the NFL players, including Plaintiffs;

(c)   Failure to require that an adequate concussive brain injury history be taken of NFL players;

///

-26-

(d)    Failure to ensure accurate diagnosis and recording of concussive brain injury so the condition can be treated in an adequate and timely manner;

(e)    Failure to invoke league-wide guidelines, policies, and procedures regarding the identification and treatment of concussive brain injury, and the return to play insofar as such matters pertain to concussive brain injury; and,

(f)    Failure to license and approve the best equipment available that will reduce the risk of concussive brain injury.

195.    The NFL breached its assumed duty to protect the health and safety of its players by subjecting NFL players to an increased risk of concussive brain injury.

196.    The NFL failed to provide complete, current, and competent information and directions to NFL athletic trainers, physicians, and coaches regarding concussive brain injuries and its prevention, symptoms, and treatment.

197.    If the NFL would have taken the necessary steps to oversee and protect the NFL players, including Plaintiffs, by developing and implementing necessary guidelines, policies, and procedures; providing reasonably safe helmets; and educating and training all persons involved with the NFL Teams in the recognition, prevention, and treatment of concussive brain injuries, the NFL players, such as Plaintiffs, would not have suffered from the subject condition or the effects of that condition, would have recovered more rapidly, or would not have suffered long-term brain damage, dementia, and depression related to dementia and CTE.

198.    Under all of the above circumstances, it was foreseeable that the NFL's violations of its duties would cause or substantially contribute to the personal injuries suffered by the Plaintiffs.

199.    The NFL committed acts of omission and commission, which collectively and severally, constituted negligence. The NFL's negligence was a proximate and producing cause of the personal injuries and other damages suffered by Plaintiff.

200.    As a result of the personal injuries of Plaintiffs, they are entitled to damages, as alleged herein or allowed by law, from the NFL m an amount reasonably anticipated to exceed the jurisdictional minimum of $25,000.

-27-

### THIRD CAUSE OF ACTION:

### FRAUD

### (As Against the NFL)

201.    Plaintiffs incorporate by reference paragraphs 1 through 205 of this Complaint as if fully set forth herein at length.

202.    From 2005 through June of 2010, the NFL made through its "Mild Traumatic Brain Injury Committee" and others, its agents, material misrepresentations to its players, former players, the Congress and the public at large that there was no link between concussions and later life cognitive/brain injury, including CTE and its related symptoms.

203.    The persons who made the misrepresentations as agents of the NFL and the NFL knew they were false.

204.    The persons who made the misrepresentations as agents of the NFL and the NFL intended to defraud, among others, the Plaintiffs in this action.

205.    The Plaintiffs, among others, justifiably and reasonably relied on these misrepresentations to their detriment in getting care for their injuries.

206.    The Plaintiffs, among others, were damaged by these misrepresentations.  Among other things, they require increased home care, loss of consortium, loss of employment, medical costs and pain and suffering.

207.    As a result of the personal injuries of Plaintiffs, they are entitled to damages, as alleged. herein or allowed by law, from the NFL in an amount reasonably anticipated to exceed the jurisdictional minimum of $25,000.

### FOURTH CAUSE OF ACTION

### NEGLIGENCE

### (As Against NFL Properties)

208.    Plaintiffs incorporate by reference paragraphs 1 through 212 as if fully set forth herein at length.

///

///

-28-

209.   NFL Properties breached its duty to ensure that the equipment it licensed and approved were of the highest possible quality and sufficient to protect the NFL players, including Plaintiffs, from the risk of concussive brain injuries.

210.   NFL Properties breached its duty by licensing the Riddell Defendants' helmets, and approving and/or requiring the use of the helmets for the NFL players, knowing or having reason to know that the helmets were negligently and defectively designed and/or manufactured.

211.   As a result of these breaches by NFL Properties, Plaintiffs suffered personal injuries as a result the long-term health effects of concussive brain injuries.

212.   As a result of the personal injuries of Plaintiffs, Plaintiffs are entitled to damages from NFL Properties, LLC in an amount reasonably anticipated to exceed the jurisdictional minimum of $25;000.00.

## FIFTH CAUSE OF ACTION

## STRICT LIABILITY FOR DESIGN DEFECT

## (As Against Riddell Defendants)

213.   Plaintiffs incorporate by reference paragraphs 1 through 217 of this Complaint as if fully set forth herein at length.

214. At the time the helmets were designed, manufactured, sold, and distributed by the Riddell Defendants, the helmets were defective in design, unreasonably dangerous, and unsafe for their intended purpose because they did not provide adequate protection against the foreseeable risk of concussive brain injury. The design defect includes; but is not limited to the following:

(a)   Negligently failing to design the subject helmet with a safe means of attenuating and absorbing the foreseeable forces of impact in order to minimize mid/or reduce the forces and energy directed to the player's head;

(b)   Negligently designing the subject helmet with a shock attenuating system which was not safely configured;

(c)   Negligently failing to properly and adequately test the helmet model;

(d)   Other acts of negligence that may be discovered during the course of this matter; and

-29-

Ex A_000077

(e)     Failing to warn Plaintiffs that their helmets would not protect against the long-term health consequences of concussive brain injury.

215.    The defective design and unreasonably dangerous condition were a proximate and producing cause of the personal injuries suffered by the Plaintiffs and other damages, including but not limited to, economic damages and non-economic damages.

216.    The Riddell Defendants are strictly liable for designing a defective and unreasonably dangerous product and for failing to warn which were proximate and producing causes of the personal injuries and other damages including, but not limited to, economic damage as alleged herein.  A safer alternative design was economically and technologically feasible at the time the product left the control of the Riddell Defendants.

217.    As a result of the personal injuries of Plaintiffs, Plaintiffs are entitled to damages from Riddell Defendants in an amount reasonably. anticipated to exceed the jurisdictional minimum of $25,000.00.

## SIXTH CAUSE OF ACTION
## (STRICT LIABILITY FOR MANUFACTURING DEFECT)
### (As Against Riddell Defendants)

218.    Plaintiffs incorporate by reference paragraphs 1 through 222 of this Complaint as if fully set forth herein at length.

219.    At the time the helmets were designed, manufactured, sold and distributed by the Riddell Defendants, the helmets were defective in their manufacturing and unreasonably dangerous and unsafe for their intended purpose because they did not provide adequate protection against the foreseeable risk of concussive brain injury. The Riddell Defendants' failure to design the helmets to design and manufacturing specifications resulted in, among other things, the following:

(a)     Negligently failing to manufacture the subject helmet with a safe means of attenuating and absorbing the foreseeable forces of impact in order to minimize and/or reduce the forces and energy directed to the player's head;

///

-30-

FIRST AMENDED COMPLAINT

Ex A_000078

1    (b)    Negligently manufacturing the subject helmet with a shock attenuating system

2    which was not safely configured;

3    (c)    Negligently failing to properly and adequately inspect and/or test the helmet model;

4    (d)    Other acts of negligence that may be discovered during the course of this matter;

5    and

6    (e)    Failure to warn Plaintiffs that its helmets wouldn't protect against concussive brain

7    injury.

8    220.    The manufacturing defect was a proximate and producing cause of the personal

9 injuries suffered by Plaintiffs and other damages, including but not limited to, economic damages

10 and non-economic damages.

11    221.    The Riddell Defendants are strictly liable for manufacturing and placing in the

12 stream of commerce a defective and unreasonably dangerous product which was a proximate and

13 producing cause of the personal injuries and other damages, including but not limited to, economic

14 damages and non-economic damages. A safe alternative design was economically and

15 technologically feasible at the time the product left the control of the Riddell Defendants.

16 As a result of the personal injuries of Plaintiffs, Plaintiffs are entitled to damages from Riddell

17 Defendants in an amount reasonably anticipated to exceed the jurisdictional minimum of

18 $25,000.00.

19    **SEVENTH CAUSE OF ACTION**

20    **FAILURE TO WARN**

21    **(As Against Riddell Defendants)**

22    222.    Plaintiffs incorporate by reference paragraphs 1 through 226 of this Complaint as if

23 fully set forth herein at length.

24    223.    The Riddell Defendants failed to provide necessary and adequate safety and

25 instructional materials and warnings of the risk and means available to reduce and/or minimize the

26 risk of concussive brain injuries while playing football.

27    ///

28    ///

-31-

Ex A_000079

1      224.    The Riddell Defendants failed to provide necessary and adequate information,

2 warnings, and/or instructional materials regarding the fact that other model helmets provided

3 greater shock attenuation from blows to the head area.

4      225.    The Riddell Defendants' failure to warn caused the Plaintiffs' personal injuries.

5      226.    As a result of the personal injuries of Plaintiffs, Plaintiffs are entitled to damages

6 from the Riddell Defendants in an amount reasonably anticipated to exceed the jurisdictional

7 minimum of $25,000.00.

8                        **EIGHTH CAUSE OF ACTION**

9                              **NEGLIGENCE**

10                  **(As Against Riddell Defendants)**

11      227.    Plaintiffs incorporate by reference paragraphs 1 through 231 of this Complaint as if

12 fully set forth herein at length.

13      228.    The Riddell Defendants should have been well aware that since 1928 repeated

14 blows to the head can lead to CTE, commonly known as "punch-drunk syndrome."

15      229.    The Riddell Defendants breached their duty of reasonable care by failing to provide

16 necessary and adequate safety and instructional materials and warnings of the risk and means

17 available to reduce and/or minimize the risk of concussive brain injuries while playing football

18 using their helmets.

19      230.    As a result of the Riddell Defendants' breach of duty, Plaintiffs have sustained

20 permanent injury.

21      231.    For the personal injuries of Plaintiffs, Plaintiffs are entitled to damages from the

22 Riddell defendants in an amount reasonably anticipated to exceed the jurisdictional minimum of

23 $25,000.00.

24                        **NINTH CAUSE OF ACTION**

25                  **LOSS OF CONSORTIUM**

26                  **(As Against All Defendants)**

27      232.    Plaintiffs incorporate by reference paragraphs 1 through 236 of this Complaint as if

28 fully set forth herein at length.

FIRST AMENDED COMPLAINT

Ex A_000080

233.    As a direct and proximate result of the carelessness, negligence and recklessness of all Defendants and of the aforesaid injuries to their husbands, the wives of Plaintiffs have been damaged as follows:

    a.    They have been and will continue to be deprived of the services, society and companionship of their husbands;

    b.    They have been and will continue to be required to spend money for medical care and household care for the treatment of their husbands; and

    c.    They have been and will continue to be deprived of the earnings of their husbands.

234.    As a result of the injuries to Plaintiffs, Plaintiffs' wives are entitled to damages from the Defendants, in an amount reasonably anticipated to exceed the jurisdictional minimum of $25,000.00.

## TENTH CAUSE OF ACTION

## WRONGFUL DEATH

### (As Against All Defendants)

235.    Plaintiffs incorporate by reference paragraphs 1 through 239 of this Complaint as if fully set forth herein at length.

236.    Greg Lens' (DECEDENT), sole surviving heirs-at-law and their relationships to him are:

| NAME: | RELATIONSHIP: |
|---|---|
| Plaintiff, Carolyn Lens | Widow |

237.    As DECEDENT's heirs, plaintiff, Carolyn Lens, is entitled to bring this action pursuant to Code of Civil Procedure §377.60, subdivision (a).

243.    On or about November 18, 2009, having suffered from multiple past traumatic brain injuries while playing professional football for the Atlanta Falcons and the Arizona Cardinals during the 1970-1972 seasons, proximately resulted in his death on November 18, 2009.

238.    Plaintiffs allege that defendants knew as early as the 1920's of the potential harmful effects on a player's brain of concussions; however, until June of 2010 they

-33-

Ex A_000081

1  concealed these facts from coaches, trainers, players and the public with negligent

2  disregard for DECEDENT's safety and life. Plaintiffs further allege that defendants'

3  negligence was a direct and proximate cause of DECEDENT's death.

4      239. As a further direct and proximate result of the hereinabove-described death,

5  DECEDENT's heirs-at-law have been and in the future will be deprived of his society,

6  care, comfort and companionship, all to their general damage in a sum within the

7  jurisdictional limits of this Court.

8      240. Plaintiffs seek prejudgment interest as prescribed by basic California law on

9  any and all damages alleged to have been suffered herein.

10  ///

11  ///

12  ///

13  ///

14  ///

15  ///

16  ///

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

-34-

FIRST AMENDED COMPLAINT

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment against Defendants, and each of them, as follows:

1.     For compensatory and general damages according to proof;

2.     For special and incidental damages according to proof;

3.     For punitive damages according to proof;

4.     For costs of the proceedings herein; and

5.     For all such other and further relief as the Court deems just.

DATED: ___8/30/11___

                ROSE, KLEIN & MARIAS LLP

By: _____
               DAVID A. ROSEN
               Attorneys for All Plaintiffs

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all claims so triable.

DATED: ___8/30/11___

                ROSE, KLEIN & MARIAS LLP

By: _____
               DAVID A. ROSEN
               Attorneys for All Plaintiffs

-35-

1   ROSE, KLEIN & MARIAS LLP
    DAVID A. ROSEN (State Bar No. 101287)
2   801 S. Grand Avenue
    11ᵗʰ Floor
3   Los Angeles, California 90017-4645
    (213) 626-0571
4   (213) 623-7755 Fax

5   Attorneys for Plaintiffs

6

7

**FILED**
LOS ANGELES SUPERIOR COURT

AUG 3 1 2011

JOHN A. CLARKE, CLERK

BY PAUL SANCHEZ, DEPUTY

8               SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                   FOR THE COUNTY OF LOS ANGELES

10

11  LARRY BARNES; WOODROW "WOODY"      )   CASE NO. BC 468483 D-15
    BENNETT; SCOT BRANTLEY; CEDRIC     )
12  BROWN; JOSEPH "BARRY" BROWN and    )   NOTICE OF RELATED CASE
    JEAN BROWN, his wife; RUDOLPH BUKICH )
13  and PATRICIA BUKICH, his wife; MICHAEL )  Complaint Filed: August 26, 2011
    CLOUD; BRIAN HOLLOWAY; JIMMIE      )
14  GILES; CAROLYN LENS; DANNY         )
    NOONAN; JOE PHILLIPS; GREGORY      )
15  ROBERTS; JESSE SOLOMON; RALPH      )
    WENZEL and ELEANOR PERFETTO, his   )
16  wife; JAMES WILDER; and ROES 1 through )
    200, Inclusive,                    )
17                                     )
18               Plaintiffs,           )
                                       )
19  v.                                 )
                                       )
20  NATIONAL FOOTBALL LEAGUE; NFL      )
    PROPERTIES LLC; RIDDELL, INC.      )
21  d.b.a.RIDDELL SPORTS GROUP, INC., ALL )
    AMERICAN SPORTS CORPORATION, d.b.a. )
22  RIDDELL/ALL AMERICAN; RIDDELL      )
    SPORTS GROUP, INC. EASTON-BELL     )
23  SPORTS, INC.; EASTON-BELL SPORTS,  )
    LLC; EB SPORTS CORP.; and RBG      )
24  HOLDINGS CORP.; and DOES 1 through 100, )
    Inclusive,                         )
25                                     )
                 Defendants.           )
26                                     )

27

28

NOTICE OF RELATED CASE

1  TO THE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD IN THE CASES

2  LISTED BELOW:

3      NOTICE IS HEREBY GIVEN, pursuant to California Rules of Court 3.300, that the

4  following related actions or proceedings are currently pending:

5         1.    Vernon Maxwell, et al. v. National Football League, et al., in Los Angeles

6             County Superior Court, Case No. BC465842, filed on July 19, 2011.

7         2.    Abrams, et al. v. All American Sports Corp., etc., et al., in Los Angeles

8             Superior Court, Case No. LC094453, filed on August 3, 2011.

9         3..   Larry Barnes, et al. v. National Football League, et al., in Los Angeles

10           County Superior Court, Case No. BC468483, filed on August 26, 2011.

11      These cases are related in that each is against an identical set of defendants on behalf of

12  former professional football players.  In each action, the Plaintiffs claim that the Defendants are

13  legally responsible for Plaintiffs' long-term injuries due to football-related concussions.

14

15

16  DATED: ___8\30\11___           ROSE, KLEIN & MARIAS LLP

17

18

19                           By: _____

20                              DAVID A. ROSEN

                                  Attorneys for All Plaintiffs

21

22

23

24

25

26

27

28

-2-

**SUMMONS** ON FIRST AMENDED
**(CITACION JUDICIAL)** COMPLAINT

**SUM-100**

**NOTICE TO DEFENDANT:** NATIONAL FOOTBALL LEAGUE; NFL
**(AVISO AL DEMANDADO):** PROPERTIES LLC; RIDDELL, INC.
d.b.a.RIDDELL SPORTS GROUP, INC., ALL AMERICAN SPORTS
CORPORATION, d.b.a. RIDDELL/ALL AMERICAN; RIDDELL
SPORTS GROUP, INC. EASTON-BELL SPORTS, INC.; EASTON-
BELL SPORTS, LLC; EB SPORTS CORP.; and RBG HOLDINGS
CORP.; and DOES 1 through 100, Inclusive

**YOU ARE BEING SUED BY PLAINTIFF:** LARRY BARNES; WOODROW
**(LO ESTÁ DEMANDANDO EL DEMANDANTE):** "WOODY" BENNETT; SCOT
BRANTLEY; CEDRIC BROWN; JOSEPH "BARRY" BROWN and JEAN
BROWN, his wife; RUDOLPH BUKICH and PATRICIA BUKICH, his
wife; MICHAEL CLOUD; BRIAN HOLLOWAY; (continued)

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)
**FILED**
Los Angeles Superior Court

AUG 31 2011

John A. Clarke, Executive Officer/Clerk
By _____ , Deputy
SHAUNYA WESLEY

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.

Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.

Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.

The name and address of the court is:
(El nombre y dirección de la corte es):
Los Angeles Superior Court
111. N. Hill Street

Los Angeles, CA 90012

CASE NUMBER:
(Número del Caso):
BC468483

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):
David A. Rosen, Esq. (S.B. 189233)
ROSE, KLEIN & MARIAS LLP               (213) 626-0571  (213) 623-7755
801 S. Grand Avenue
Los Angeles, CA 90017-4645

DATE:
(Fecha) AUG 31 2011         Clerk, by _____ , Deputy
                            (Secretario)                     (Adjunto)
                                                    Shaunya Wesley

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010).)

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of (specify):

3. ☐ on behalf of (specify):

under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
       ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
       ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
       ☐ other (specify):
4. ☐ by personal delivery on (date):

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**
**ON FIRST AMENDED COMPLAINT**

Legal
Solutions
Plus

Page 1 of 1

Code of Civil Procedure §§ 412.20, 465

Ex A_000086

**SUM-200(A)**

| SHORT TITLE: NATIONAL FOOTBALL LEAGUE, et al. v. LARRY BARNES, et al. | CASE NUMBER: BC468483 |
|---|---|

### INSTRUCTIONS FOR USE

➔ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

➔ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

List additional parties (Check only one box. Use a separate page for each type of party.):

[X] Plaintiff　　[ ] Defendant　　[ ] Cross-Complainant　　[ ] Cross-Defendant

JIMMIE GILES; CAROLYN LENS; DANNY NOONAN; JOE PHILLIPS; GREGORY ROBERTS; JESSE SOLOMON; RALPH WENZEL and ELEANOR PERFETTO, his wife; JAMES WILDER; and ROES 1 through 200, Inclusive.

Page 1 of 1

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
Attachment to Summons
ON FIRST AMENDED COMPLAINT

Legal
Solutions
Plus

Ex A_000087

CIV-110

**ATTORNEY OR PARTY WITHOUT ATTORNEY** *(Name, State Bar number, and address):*
David Rosen (SBN 101287)
ROSE KLEIN & MARIAS LLP
801 S. Grand Avenue, 11th Floor
Los Angeles, CA 90017
TELEPHONE NO.: 213-626-0571    FAX NO. *(Optional):*
E-MAIL ADDRESS *(Optional):*
ATTORNEY FOR *(Name):* Plaintiffs, Larry Barnes et al.

**FILED**
Los Angeles Superior Court
SEP 13 2011
JOHN A. CLARKE, CLERK
*R. Barrios*
BY R. BARRIOS, DEPUTY

REC'D
SEP 13 2011
FILING WINDOW

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** Los Angeles
STREET ADDRESS: 111 N. Hill St.
MAILING ADDRESS:
CITY AND ZIP CODE: Los Angeles, CA 90012
BRANCH NAME: Central District

PLAINTIFF/PETITIONER: Larry Barnes, et al.

DEFENDANT/RESPONDENT: National Football League, et al.

**REQUEST FOR DISMISSAL**

- [ ] Personal Injury, Property Damage, or Wrongful Death
  - [ ] Motor Vehicle   [ ] Other
- [ ] Family Law   [ ] Eminent Domain
- [X] Other *(specify):* Fraud

CASE NUMBER
BC468483

- A conformed copy will not be returned by the clerk unless a method of return is provided with the document. -

1. **TO THE CLERK:** Please dismiss this action as follows:
   a. (1) [ ] With prejudice   (2) [X] Without prejudice
   b. (1) [X] Complaint   (2) [ ] Petition
   (3) [ ] Cross-complaint filed by *(name):*                          on *(date):*
   (4) [ ] Cross-complaint filed by *(name):*                          on *(date):*
   (5) [ ] Entire action of all parties and all causes of action
   (6) [X] Other *(specify):* As to Plaintiffs Lee Roy Selmon and Dewey Selmon ONLY. This is not a retraxit.

2. *(Complete in all cases except family law cases.)*
   [ ] Court fees and costs were waived for a party in this case. *(This information may be obtained from the clerk. If this box is checked, the declaration on the back of this form must be completed).*

Date: September 12, 2011

David Rosen (SBN 101287)
(TYPE OR PRINT NAME OF [X] ATTORNEY   [ ] PARTY WITHOUT ATTORNEY)
*If dismissal requested is of specified parties only of specified causes of action only, or of specified cross-complaints only, so state and identify the parties, causes of action, or cross-complaints to be dismissed.

▶ _____
                              (SIGNATURE)
Attorney or party without attorney for:
[X] Plaintiff/Petitioner   [ ] Defendant/Respondent
[ ] Cross-Complainant

3. **TO THE CLERK:** Consent to the above dismissal hereby given.**
   Date:

(TYPE OR PRINT NAME OF [ ] ATTORNEY   [ ] PARTY WITHOUT ATTORNEY)
** If a cross-complaint - or Response (Family Law) seeking affirmative relief - is on file, the attorney for cross-complaint (respondent) must sign this consent if required by Code of Civil Procedure section 581 (i) or (j).

▶ _____
                              (SIGNATURE)
Attorney or party without attorney for:
[ ] Plaintiff/Petitioner   [ ] Defendant/Respondent
[ ] Cross-Complainant

*(To be completed by clerk)*
4. [X] Dismissal entered as requested on *(date):* 9-13-11
5. [ ] Dismissal entered on *(date):*                          as to only *(name):*
6. [ ] Dismissal not entered as requested for the following reasons *(specify):*

7. a. [ ] Attorney or party without attorney notified on *(date):*
   b. [ ] Attorney or party without attorney not notified. Filing party failed to provide
      [ ] a copy to be conformed   [ ] means to return conformed copy

Date: 9-13-11                    Clerk, by *R. Barrios*                    , Deputy

Form Adopted for Mandatory Use
Judicial Council of California
CIV-110 (Rev. July 1, 2009)

**REQUEST FOR DISMISSAL**

Page 1 of 2
Code of Civil Procedure § 581 et seq.;
Gov. Code, § 68637(c); Cal. Rules of Court, rule 3.1390
www.courtinfo.ca.gov

Ex A_000088

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY**

This case has been assigned to District Judge Otis D. Wright II and the assigned discovery Magistrate Judge is Jay C. Gandhi.

The case number on all documents filed with the Court should read as follows:

## CV11- 8396 ODW (JCGx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| | | |
|---|---|---|
| **[X] Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | **[ ] Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | **[ ] Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

| | |
|---|---|
| **I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)<br><br>LARRY BARNES, et al. (See attachment) | **DEFENDANTS**<br><br>NATIONAL FOOTBALL LEAGUE, et al. (See attachment) |
| **(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)<br><br>(See attachment) | Attorneys (If Known)<br><br>(See attachment) |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff ☑ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☐ 1 Original Proceeding ☑ 2 Removed from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district (specify): ☐ 6 Multi-District Litigation ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☑ Yes ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☑ No ☑ **MONEY DEMANDED IN COMPLAINT: $** $25,000+ (according to proof)

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
(See attachment)

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS<br>PERSONAL INJURY | TORTS<br>PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☑ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | **FORFEITURE / PENALTY** | **PROPERTY RIGHTS** |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury- Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury- Product Liability | ☐ 443 Housing/Acco- mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | | **SOCIAL SECURITY** |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities - Employment | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | **IMMIGRATION** | | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | **REAL PROPERTY** | ☐ 462 Naturalization Application | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 463 Habeas Corpus- Alien Detainee | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 465 Other Immigration Actions | | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determi- nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | | | | **FEDERAL TAX SUITS** |
| ☐ 950 Constitutionality of State Statutes | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

CV11 08396

**FOR OFFICE USE ONLY:** Case Number: _____

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?  ☑ No  ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case?  ☑ No  ☐ Yes
If yes, list case number(s): (Please see separately filed Notice of Related Cases regarding cases being removed concurrently with this case.)

Civil cases are deemed related if a previously filed case and the present case:
(Check all boxes that apply)  ☐ A. Arise from the same or closely related transactions, happenings, or events; or
☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐  Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| (See attachment) | (See attachment) |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐  Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| (See attachment) | (See attachment) |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
   Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | (See attachment) |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved

**X. SIGNATURE OF ATTORNEY (OR PRO PER):** _John M V___    Date  October 11, 2011

**Notice to Counsel/Parties:**  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

_Attachment to Civil Cover Sheet for Barnes, et al. v. National Football League, et al._

_Section I:_

| PLAINTIFFS | DEFENDANTS |
|---|---|
| LARRY BARNES; WOODROW "WOODY" BENNETT; SCOT BRANTLEY; CEDRIC BROWN; JOSEPH "BARRY" BROWN and JEAN BROWN, his wife; RUDOLPH BUKICH and PATRICIA BUKICH, his wife; MICHAEL CLOUD; BRIAN HOLLOWAY; JIMMIE GILES; CAROLYN LENS; DANNY NOONAN; JOE PHILLIPS; GREGORY ROBERTS; JESSE SOLOMON; RALPH WENZEL and ELEANOR PERFETTO, his wife; JAMES WILDER; and ROES 1 through 200, Inclusive, | NATIONAL FOOTBALL LEAGUE; NFL PROPERTIES LLC; RIDDEL, INC. d/b/a RIDDELL SPORTS GROUP, INC.; ALL AMERICAN SPORTS CORPORATION, d/b/a RIDDELL/ALL AMERICAN; RIDDELL SPORTS GROUP, INC., EASTON-BELL SPORTS, INC.; EASTON-BELL SPORTS, LLC; EB SPORTS CORP.; and RBG HOLDINGS CORP. |
| _Attorneys for Plaintiffs:_ | _Attorneys for Defendants National Football League and NFL Properties LLC:_ |
| ROSE, KLEIN & MARIAS LLP<br>DAVID A. ROSEN<br>801 South Grand Avenue, Eleventh Floor<br>Los Angeles, CA 90017-4645<br>Telephone: (213) 626-0571<br>Facsimile: (213) 623-7755 | MUNGER, TOLLES & OLSON LLP<br>RONALD L. OLSON<br>JOHN M. RAPPAPORT<br>355 South Grand Avenue, Thirty-Fifth Floor<br>Los Angeles, CA 90071-1560<br>Telephone: (213) 683-9100<br>Facsimile: (213) 687-3702<br><br>_(Pro Hac Vice applications to be filed)_<br>PAUL, WEISS, RIFKIND, WHARTON &<br>  GARRISON LLP<br>BRAD S. KARP<br>THEODORE V. WELLS, JR.<br>LYNN B. BAYARD<br>1285 Avenue of the Americas<br>New York, NY 10019-6064<br>Telephone: (212) 373-3000<br>Facsimile: (212) 757-3990 |

*Section VI:*

United States Civil Statute: Labor Management Relations Act, 29 U.S.C. § 141, *et seq.*; suit for negligence, "negligence-monopolist," fraud and loss of consortium against the National Football League and NFL Properties LLC, arising from and/or substantially dependent on collective bargaining agreements.

*Section IX:*

| a. **Plaintiffs:** | |
|---|---|
| *California Counties:* | *States other than California* |
| Riverside | Florida<br>Maryland<br>Nebraska<br>Oklahoma<br>Oregon<br>Texas |

## b. **Defendants:**

Plaintiffs allege that Defendants reside as follows:

National Football League is an unincorporated association with its headquarters located in the State of New York. The National Football League regularly conducts business in California.

NFL Properties, LLC is a limited liability company organized and existing under the laws of the State of Delaware with its headquarters in the State of New York. NFL Properties, LLC regularly conducts business in California.

Riddell, Inc. (*d/b/a* Riddell Sports Group, Inc.) is a corporation organized and existing under the laws of the State of Illinois. Riddell, Inc. regularly conducts business in California.

All American Sports Corporation, d/b/a Riddell/All American, is a corporation organized and existing under the laws of the State of Delaware. All American Sports Corporation regularly conducts business in California.

Riddell Sports Group, Inc. is a Delaware corporation with its principal place of business in Texas. Riddell Sports Group, Inc. regularly conducts business in California.

Easton-Bell Sports, Inc. is a California corporation, incorporated in Delaware with a principal place of business in California.

Easton-Bell Sports, LLC is incorporated in Delaware, with a principal place of business in New York. Easton-Bell Sports, LLC regularly conducts business in California.

EB Sports Corp. is a Delaware corporation with its principal place of business in California.

RBG Holdings Corp. is a Delaware corporation with its principal place of business in California.

### c.  Claims

On information and belief, as of this time, and based on the allegations set forth in the Complaint, all of the claims against the National Football League and NFL Properties LLC arose in New York, and possibly other states.